Filed 3/14/14  P. v. Hines CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | C063021 |
| v. | (Super. Ct. No. 08F02808) |
| RODNEY TYRONE HINES et al., | |
| Defendants and Appellants. | |
| THE PEOPLE, | |
| Plaintiff and Respondent, | C063709 |
| v. | (Super. Ct. No. 08F02808) |
| JERMAINE SHONTREL ELLINGTON, | |
| Defendant and Appellant. | |
| THE PEOPLE, | |
| Plaintiff and Respondent, | C064130 |
| v. | (Super. Ct. No. 08F02808) |
| ANGELO EDWARDLEE BYRD, | |
| Defendant and Appellant. | |

1

Angelo Edwardlee Byrd, Jermaine Shontrel Ellington, Rodney Tyrone Hines and Mario Jamal Johnson were variously convicted of the following crimes in relation to a home invasion robbery: first degree residential robbery, first degree attempted robbery of a 14-year-old minor, first degree attempted robbery of a 10-year-old minor, assault with a firearm, assault with intent to commit rape, and sexual battery. Gang and firearms use enhancement allegations were found to be true.

Defendants appeal their convictions and/or sentences on various grounds. We consolidated the appeals for argument and decision and address the same or related claims together in this opinion.

We conclude the contentions of Byrd and Ellington lack merit, and Johnson's appellate claim is forfeited. As for Hines, we agree with his contention, discussed in part XIV of this opinion, that the trial court erred in imposing five-year sentence enhancements pursuant to Penal Code section 667, subdivision (a) on the determinate terms for count two (attempted robbery) and count six (sexual battery). We also agree with his contention, discussed in part XV of this opinion, that the trial court erred in imposing a full-term sentence on count six (sexual battery). His other contentions lack merit.

We will vacate the sentences imposed against Hines on counts two and six and remand the matter to the trial court to resentence Hines on those counts. The judgments are otherwise affirmed.

## BACKGROUND

As she left her home L. J. (Mother) saw five Black men walk down the driveway she shared with her neighbors. The men walked on both sides of Mother's car to allow her car to pass. Mother saw the men's faces and clothing. Mother's children--a 14-year-old daughter (Daughter), a 10-year-old son (Son) and their younger siblings--were at home alone.

2

Daughter was walking down the stairs of her home when five men, all carrying guns, rushed in the front door. One of the intruders, defendant Ellington, locked the door. The intruders pulled down their masks and Daughter saw their faces.

The intruders pointed their guns at Daughter and ordered her to get down. They demanded to know where the money was and said, "[w]e know you got money." They ransacked her house.

Daughter tried to run up the stairs but someone pulled her down the stairs by the back of her shirt. Some of the intruders, including one who wore grey Vans brand shoes, ran past Daughter to the second floor of the house. Daughter later identified the intruder with the grey Vans shoes as defendant Johnson.

One of the intruders who went upstairs entered Son's room and pointed a gun at Son. The intruder threatened to shoot Son if he moved or said anything.

Two of the intruders stayed with Daughter on the stairway. One of them wore shoes with multi-colored soles, like a pair of shoes Daughter owned. This intruder was later identified as Byrd.

On the stairway, Daughter was hit with a gun. Her head was held down and she was punched in the face. Someone ordered that Daughter be brought upstairs and said, "[s]trip the bitch." Byrd took off Daughter's shirt and bra. He choked Daughter and dragged her upstairs to the hallway bathroom. There, Daughter's head was hit against the sink. Hines and Byrd were with Daughter in the hallway bathroom.

Byrd then took Daughter to Mother's bedroom and bent her over the bed. The other intruders were in the room. Some of them were looking through the things in the room. Daughter tried to grab the telephone but Byrd hit her. Byrd unbuckled Daughter's belt and pants and felt her bare breast with his hand.

During the incident, the intruders referred to each other as "Blood." Son reported to an investigating deputy that he heard the intruders ask, "[w]here's the money, Blood?"

3

The intruders ran out of the house through the back sliding door when Mother returned home and honked her car horn.

Daughter told deputies the intruders were four to six Black males in their 20's, of average build, and wearing dark-colored hooded sweatshirts and dark-colored pants. She reported that each intruder carried a gun. Mother similarly reported seeing four to six Black males in their teens or early 20's, wearing dark-colored hooded sweatshirts.

Deputies were informed that the perpetrators fled the victims' house and ran toward Stockton Boulevard. Within 10 minutes after Daughter called 911 to report the crimes, Sergeant Craig Goncalves saw defendants--four Black males--walking together along northbound Stockton Boulevard. Defendants were less than a mile from the victims' house. Defendants continued walking intently, ignoring the patrol cars driving past them with lights and sirens activated. It appeared to Goncalves that defendants were trying not to be noticed.

Goncalves made a U-turn to contact the group. He and his partner Deputy Julius Wallace stopped Ellington, Johnson and Byrd at the intersection of Stockton Boulevard and Fruitridge Road, near a Rite Aid drug store. Hines crossed to the opposite side of Stockton Boulevard and walked away from Goncalves and Wallace but was subsequently detained by Sergeant Timothy Gorham.

Mother and Daughter were taken separately to the Rite Aid parking lot for show-ups. Mother was not present at Daughter's show-up, and Daughter did not speak with Mother before her show-up. Each positively identified defendants as the perpetrators.

A palm print obtained from the sliding glass door at the victims' house matched Johnson's palm print. Forensic analysis determined that the shoes worn by Byrd could have made a shoeprint found in the victims' backyard. Law enforcement officers also found a loaded .45 caliber semiautomatic handgun magazine in a neighbor's backyard.

Additional facts are referenced in the discussion as relevant to the contentions on appeal.

Defendants were charged with (1) first degree residential burglary (Pen. Code, § 459),[1] (2) attempted first degree robbery of Daughter (§§ 664, 211, 213, subd. (a)(1)(A)), (3) attempted first degree robbery of Son (§§ 664, 211, 213, subd. (a)(1)(A)), (4) assault with a firearm against Son (§ 245, subd. (a)(2)), (5) assault with intent to commit rape against Daughter (§§ 220, subd. (b), 460), and (6) sexual battery of Daughter (§ 243.4, subd. (a)).  It was alleged in counts one through six that defendants or a principal personally used a firearm (§§ 1203.06, subd. (a)(1), 12022.5, subd. (a), 12022.53, subds. (b), (e)(1)), causing the offense to be a serious and violent felony (§§ 1192.7, subd. (c)(8), 667.5, subd. (c)(8)).  It was also alleged that Ellington, Hines and Byrd committed the charged offenses for the benefit of, at the direction of and in association with a criminal street gang with the specific intent to promote, further and assist in criminal conduct by gang members (§ 186.22, subd. (b)(1)).  No gang enhancement allegation was charged against Johnson.  Hines was additionally charged in count seven with possession of a firearm by a felon (former § 12021, subd. (a)(1)).

The jury convicted Byrd, Hines and Johnson on counts one and two and found the enhancement allegations in those counts to be true.  Byrd and Hines were also convicted on counts five and six and the jury found the enhancement allegations in those counts to be true.  Additionally, Hines was convicted on count seven.  The jury found Byrd, Hines and Johnson not guilty on the remaining counts.  The trial court declared a mistrial as to Ellington because the jury could not reach a verdict on the charges against him.

Ellington was retried on counts one through six.  The second jury convicted him on counts one through four and found the gang enhancement allegation and the allegation that a principal used a firearm to be true but found the allegation that Ellington personally

---

[1] Undesignated statutory references are to the Penal Code.

5

used a firearm to be not true. The second jury deadlocked on counts five and six. The trial court declared a mistrial on those counts.

DISCUSSION

I

A

Ellington, Hines and Byrd contend the trial court erred in denying their motion, pursuant to section 1538.5, to suppress evidence arising from their arrest.[2] In particular, defendants claim that handcuffing them and placing them in patrol cars resulted in a de facto arrest, and such arrest violates the Fourth Amendment to the federal Constitution because it is not supported by probable cause. If the officers' conduct did not result in a de facto arrest, Ellington and Hines maintain that no specific and articulable fact supports a reasonable suspicion that defendants committed a crime, justifying their detention.

We review defendants' claims under federal constitutional standards (*People v. Rogers* (2009) 46 Cal.4th 1136, 1156, fn. 8), and use our independent judgment to determine whether the evidence adduced at the hearing on defendants' section 1538.5 motion established that an arrest occurred when officers stopped defendants and whether probable cause or reasonable suspicion existed (*People v. Butler* (2003) 111 Cal.App.4th 150, 159-160; *People v. Rivera* (1992) 8 Cal.App.4th 1000, 1005-1006).

The Fourth Amendment to the federal Constitution, made applicable to the states through the Fourteenth Amendment, guarantees the right to be secure against unreasonable seizures. (*People v. Celis* (2004) 33 Cal.4th 667, 673 (*Celis*).) Ellington, Hines and Byrd contend they were placed under arrest prior to the in-field show-ups, but

---

[2] Defendants' claim is based on the June 23-24, 2009 hearing on their section 1538.5 motion. Section 1538.5 authorizes a motion to suppress as evidence any tangible or intangible thing obtained as a result of a search or seizure on the grounds that the search or seizure without a warrant violated federal or state constitutional standards.

6

the Attorney General contends defendants were merely temporarily detained for investigation purposes before the show-ups. The distinction between an arrest and a detention is significant under the Fourth Amendment because when the seizure of a person amounts to an arrest, it must be supported by an arrest warrant or probable cause (*Celis, supra,* 33 Cal.4th at p. 673), neither of which the Attorney General contends existed when officers stopped defendants. (*People v. Soun* (1995) 34 Cal.App.4th 1499, 1515 (*Soun*) [in assessing the constitutional propriety of a seizure, a court must first determine whether the seizure was an arrest or a detention because the constitutional standard for a detention " 'is of [a] lesser degree than that applicable to an arrest,' " italics omitted].) By comparison, an investigative detention need not be justified by probable cause. (*Florida v. Royer* (1983) 460 U.S. 491, 498-499 [75 L.Ed.2d 229, 236-237]; *Celis, supra*, 33 Cal.4th at p. 674.) A detention requires only an objectively reasonable, articulable suspicion that the person to be stopped has committed or is about to commit a crime, which is a "less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence." (*Illinois v. Wardlow* (2000) 528 U.S. 119, 123 [145 L.Ed.2d 570, 576].)

" '[T]here is no hard and fast line to distinguish permissible investigative detentions from impermissible de facto arrests. Instead, the issue is decided on the facts of each case, with focus on whether the police diligently pursued a means of investigation reasonably designed to dispel or confirm their suspicions quickly . . . .' [Citations.] Important to this assessment . . . are the 'duration, scope and purpose' of the stop. [Citation.]" (*Celis, supra*, 33 Cal.4th at pp. 674-675.) " ' "[T]he brevity of the invasion of the individual's Fourth Amendment interests is an important factor in determining whether the seizure is so minimally intrusive as to be justifiable on reasonable suspicion." ' [Citation.]" (*Id.* at p. 675.) "With regard to the scope of the police intrusion, stopping a suspect at gunpoint, handcuffing him, and making him sit on the ground for a short period . . . do not convert a detention into an arrest. [Citations.] [¶]

7

Of significance too are the facts known to the officers in determining whether their actions went beyond those necessary to effectuate the purpose of the stop, that is, to quickly dispel or confirm police suspicions of criminal activity. [Citations.] Although a routine traffic stop would rarely justify a police officer in drawing a gun or using handcuffs, such actions may be appropriate when the stop is of someone suspected of committing a felony." (*Id.* at pp. 675-676.) We look at the totality of the circumstances of the detention to determine whether an investigatory stop has turned into a de facto arrest. (*Gallegos v. City of Los Angeles* (9th Cir. 2002) 308 F.3d 987, 991.)

Here, the length of the detention was not excessive, and law enforcement officers acted diligently to investigate whether defendants were involved in the crimes reported by Daughter. Goncalves stopped defendants because he believed they may be involved in the reported crimes. After securing defendants, law enforcement officers quickly ascertained their identities and promptly arranged in-field show-ups to determine whether defendants were the individuals responsible for the reported crimes. The computer assisted dispatch report shows that the first show-up was conducted within 11 minutes after Ellington, Johnson and Byrd were detained. The second show-up started about 27 minutes after defendants were stopped. Mother and Daughter were transported, without unreasonable delay, to the parking lot where defendants were detained for the in-field identifications. Thus, the detention of defendants did not last longer than was necessary to verify or dispel Goncalves's suspicion that defendants may be involved in the burglary and assault, and law enforcement officers diligently pursued such investigation. (*Gallegos v. City of Los Angeles, supra,* 308 F.3d at pp. 991-993 [detention for 45 minutes to an hour was reasonable where officers diligently investigated whether defendant was the person who tried to break into the victim's house]; *Soun, supra*, 34 Cal.App.4th at pp. 1520, 1524 [detention for about 45 minutes while sergeant contacted authorities in the jurisdiction where the murder was committed to obtain instructions and to provide a description of the subjects detained was no more protracted than was

8

reasonably necessary]; *In re Carlos M.* (1990) 220 Cal.App.3d 372, 381, 385 [detention for 30 minutes before rape victim identified defendant was reasonable].)

Ellington, Hines and Byrd claim that handcuffing them resulted in an arrest. Ellington argues that stopping him at gunpoint, handcuffing him without asking any questions, and placing him in the back of a patrol car transformed his detention into an arrest. Hines says that handcuffing him and taking him in a patrol car to a parking lot about 200 yards from where he was stopped constituted an arrest.

Handcuffing and detention at gunpoint substantially increase the intrusiveness of a stop and is not part of a typical investigatory detention. (*Washington v. Lambert* (9th Cir. 1996) 98 F.3d 1181, 1188; *People v. Stier* (2008) 168 Cal.App.4th 21, 27 (*Stier*).) Nevertheless, stopping a suspect at gunpoint, handcuffing him, and placing him in a patrol car do not automatically elevate a seizure into an arrest requiring probable cause. (*Gallegos v. City of Los Angeles, supra,* 308 F.3d at pp. 991-992; *Celis, supra*, 33 Cal.4th at p. 675; *Soun, supra*, 34 Cal.App.4th at pp. 1517-1520.) This is because an officer may take reasonably necessary steps to protect his or her safety and to maintain the status quo during a detention. (*Celis, supra*, 33 Cal.4th at p. 675.) The issue is whether the methods used during a detention were reasonably necessary under all of the circumstances of the detention. (*Stier, supra,* 168 Cal.App.4th at p. 27; *In re Antonio B.* (2008) 166 Cal.App.4th 435, 441.)

In *Celis, supra*, 33 Cal.4th at page 676, a single officer detained two men suspected of drug trafficking. The officer drew his gun to ensure that both suspects would stop, handcuffed them, and made them sit on the ground for a few minutes while officers checked whether anyone was inside defendant's house. (*Ibid.*) The California Supreme Court found that the procedure officers used did not turn defendant's detention into an arrest. (*Ibid.*) In *Soun, supra*, 34 Cal.App.4th at pages 1517-1520, there was no de facto arrest where six suspects were removed from a car at gunpoint by a large number of police officers, forced to lie on the ground, handcuffed, and placed in separate police

9

cars because there was reason to believe the suspects were armed and might flee. In *People v. Bowen* (1987) 195 Cal.App.3d 269, 272-274, the defendant was not under arrest merely because he was handcuffed to a guard rail for 25 minutes while the victim was brought to the area to identify him because police officers promptly arranged the in-field show-up to determine whether defendant was one of the assailants. Likewise, in the case *In re Carlos M., supra,* 220 Cal.App.3d at pages 382-385, handcuffing defendant and transporting him and another suspect in a patrol car to a nearby hospital for an identification by the victim did not transform defendant's detention into an arrest.

In *United States v. Alvarez* (9th Cir. 1990) 899 F.2d 833, 835, three officers approached defendant with their weapons drawn, ordered defendant to get out of the car, and handcuffed him. It was held that because officers had reason to believe defendant was carrying explosives, the police actions were justified and did not convert an investigatory stop into an arrest. (*Id.* at pp. 838-839.) In *Gallegos v. City of Los Angeles, supra*, 308 F.3d 987, defendant was ordered from his truck at gunpoint, handcuffed, placed in the back of a patrol car, transported to the victim's house, and detained for 45 minutes to an hour, all without asking him for his identification. He was released after a witness confirmed he was not the man who tried to break into the victim's house. (*Id.* at p. 989.) The appellate court said the officers' conduct did not result in an arrest, even where defendant cooperated with all police commands, because the detention was brief, calculated solely to ensure that the police had the right person, and resulted in defendant's prompt vindication. (*Id.* at pp. 991-993.)

Examining the circumstances present at the time of the detention here, including the facts known to officers, we conclude the conduct by law enforcement authorities was reasonable and did not transform the encounter with defendants into an arrest. While Ellington and Byrd were cooperative after they were stopped and they did not attempt to flee, when Goncalves and Wallace initiated the stop there were only two officers approaching three adult male suspects. (*Washington v. Lambert, supra,* 98 F.3d at

10

p. 1190 [use of aggressive police tactics during investigatory stop may be reasonable where police are outnumbered]; *Celis, supra*, 33 Cal.4th at p. 676 [detention did not become an arrest simply because a single officer drew his gun to stop two suspects]; *Stier, supra,* 168 Cal.App.4th at pp. 27-28 [the fact that the suspects outnumber the officers may justify the use of handcuffs].) Unlike the cases defendants analogize to this one, Goncalves and Wallace had reason to believe that defendants may be armed and might flee because officers were informed the perpetrators carried guns and ran from the crime scene. (*Washington v. Lambert, supra,* 98 F.3d at p. 1190 [no information that persons stopped were armed or that there had been a violent crime in the area shortly before the stop]; *United States v. Ricardo D*. (9th Cir. 1990) 912 F.2d 337, 340 [no reason to believe juvenile was dangerous and there were no other people in the area when the juvenile was seized]; *United States v. Ramos-Zaragosa* (9th Cir. 1975) 516 F.2d 141, 144 [no facts showing fear for officer safety]; *United States v. Strickler* (9th Cir. 1974) 490 F.2d 378, 379-380 [no facts in the opinion showed that defendant presented a danger to officers].) Officers were also informed that the perpetrators recently committed violent crimes, and more armed suspects were unaccounted for at the time of the stop. Goncalves was on "elevated alert." Additionally, Goncalves and Wallace stopped defendants in a high crime area and there were people watching the police activity, all of which could reasonably raise safety or security concerns. (*Allen v. City of Los Angeles* (9th Cir. 1995) 66 F.3d 1052, 1057 [fact that stop occurred in a high crime area was relevant to appellate court's consideration of whether police detention tactics resulted in an arrest]; *People v. Courtney* (1970) 11 Cal.App.3d 1185, 1188-1189, 1191-1192 [officer's statement that he would have to transport defendant to the university police station for further questioning because there was a growing crowd gathering to watch the stop did not transform investigatory stop into an arrest].) Officers are entitled to take reasonable precautions, including an armed approach and the use of handcuffs, when they encounter a potentially dangerous situation or where there is a risk that a suspect might

11

flee. (*Washington v. Lambert, supra,* 98 F.3d at pp. 1186-1187 [a court must consider the dangerousness of the situation that confronted the police when evaluating a Fourth Amendment claim]; *Celis, supra,* 33 Cal.4th at p. 676 [not unreasonable for detective to draw his gun because suspects might flee]; *Stier, supra,* 168 Cal.App.4th at p. 27 [handcuffing a suspect during a detention has been sanctioned where the officer had a reasonable basis for believing the suspect posed a present threat or might flee].)

Wallace testified he probably had his gun out when he exited the patrol car, and he immediately placed Johnson in handcuffs.[3] There is no evidence that Wallace had his gun out after that point. As for Hines, it is not unreasonable for a single officer transporting a suspect to handcuff the suspect before placing him in the back of his patrol car. (*In re Carlos M., supra,* 220 Cal.App.3d at p. 385 [handcuffing assures officer's safety when transporting two men suspected of committing a violent crime].)

Byrd and Hines also contend that the officers should have used the least intrusive means of investigation. But the United States Supreme Court has rejected the argument that law enforcement officers must use the least intrusive means available to verify or dispel their suspicion that a defendant has engaged in criminal activity. (*United States v. Sokolow* (1989) 490 U.S. 1, 10-11 [104 L.Ed.2d 1, 12].) The Supreme Court explained, "[t]he reasonableness of the officer's decision to stop a suspect does not turn on the availability of less intrusive investigatory techniques. Such a rule would unduly hamper the police's ability to make swift, on-the-spot decisions . . . and it would require courts to 'indulge in "unrealistic second-guessing." ' [Citation]" (*Id.* at p. 11 [104 L.Ed.2d at p. 12]; accord, *Board of Education v. Earls* (2002) 536 U.S. 822, 837 [153 L.Ed.2d 735, 749] ["this Court has repeatedly stated that reasonableness under the Fourth Amendment does not require employing the least intrusive means"].) We focus instead on whether

_____

**3** Goncalves, who handcuffed Byrd, did not know whether he drew his gun when he initially contacted defendants. Gorham did not draw his gun when he stopped Hines.

the officers' actions were reasonable under all of the circumstances presented. (*Gallegos v. City of Los Angeles, supra,* 308 F.3d at p. 991; *Celis, supra*, 33 Cal.4th at pp. 674-676; *Stier, supra,* 168 Cal.App.4th at p. 27.)

We conclude the procedures the officers used to temporarily detain defendants until the in-field show-ups commenced--the armed approach by Wallace, handcuffing, placing defendants in patrol cars, and transporting Hines approximately 200 yards to the location where the other defendants were detained--were reasonably necessary. The police conduct here did not exceed the permissible bounds of an investigatory stop. (*Gallegos v. City of Los Angeles, supra,* 308 F.3d at pp. 989, 991-992 [detention at gunpoint, handcuffing, and transporting suspect a few miles, in a patrol car, to the victim's house for identification did not result in an arrest]; *United States v. Parr* (9th Cir. 1988) 843 F.2d 1228, 1231 [placing defendant in the back of a patrol car did not result in an arrest]; *United States v. Bautista* (9th Cir. 1982) 684 F.2d 1286, 1287-1290 [handcuffing suspects while officers investigated their explanation for being in the vicinity of a recent armed robbery was reasonable where officers did not know where the third armed suspect was, one of the officers would be left behind with the two men as his partner investigated, and the suspects appeared extremely nervous]; *People v. Harris* (1975) 15 Cal.3d 384, 391 [acknowledging that there are some situations where it might be reasonable to transport a suspect to the crime scene for possible identification]; *Soun, supra*, 34 Cal.App.4th at p. 1517; *People v. Torres* (2010) 188 Cal.App.4th 775, 785-786 [placing defendant in a patrol car pending an inventory search of his truck did not constitute a de facto arrest]; *In re Carlos M., supra,* 220 Cal.App.3d at p. 385 [no arrest resulted where a single officer handcuffed two rape suspects and transported them a short distance in a police car].)

Ellington and Byrd next claim that transporting them to an in-field show-up resulted in an arrest. But there was no evidence at the section 1538.5 hearing that either of these defendants was transported for a show-up. (*People v. Fiscalini* (1991)

13

228 Cal.App.3d 1639, 1644, fn. 5 [our review of the denial of a section 1538.5 motion is limited to the evidence before the trial court at the hearing on such motion]; *People v. Neighbours* (1990) 223 Cal.App.3d 1115, 1118 [evidence not before the trial court upon the section 1538.5 motion is not part of the record subject to review by this court].)  For this reason, their reliance on prearrest transportation cases is misplaced.  In any event, prearrest transportation does not necessarily result in a de facto arrest.  (*Gallegos v. City of Los Angeles, supra,* 308 F.3d at pp. 989, 991-992; *United States v. Kapperman* (11th Cir. 1985) 764 F.2d 786, 789-792; *People v. Harris, supra,* 15 Cal.3d at pp. 390-391; *Soun, supra*, 34 Cal.App.4th at p. 1517; *In re Carlos M., supra,* 220 Cal.App.3d at pp. 383-384; *In re Lynette G.* (1976) 54 Cal.App.3d 1087, 1092-1094.)

The facts before us are also distinguishable from those in *Kaupp v. Texas* (2003) 538 U.S. 626 [155 L.Ed.2d 814], a case Ellington likens to his.  Seventeen–year–old Kaupp was awakened in his bedroom at 3:00 a.m. by at least three police officers, one of whom told him " ‘ "we need to go and talk." ’ "  (*Id.* at pp. 628-629 [155 L.Ed.2d at pp. 819-821].)  The boy was taken out of his home in handcuffs, without shoes, dressed only in his underwear, placed in a patrol car, driven to the scene of a crime and then to the sheriff's headquarters, where he was taken into an interrogation room, read his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694], and questioned. (*Kaupp v. Texas, supra,* at pp. 628-629, 631 [155 L.Ed.2d at pp. 819-821].)  In contrast, Goncalves and Wallace contacted defendants on the street.  (*Kentucky v. King* (2011) ___ U.S. ___ [179 L.Ed.2d 865, 884] [Fourth Amendment interests are strongest in our homes]; *Illinois v. McArthur* (2001) 531 U.S. 326, 336 [148 L.Ed.2d 838, 851] [detention on the street is a less serious restriction than police entry into the home].)  And there is no evidence at the time of the section 1538.5 hearing that defendants were transported anywhere for an interrogation.

The next question is whether the totality of the circumstances supports a particularized and objectively reasonable suspicion that defendants committed the

14

reported crimes, thereby permitting officers to detain defendants to investigate. (*United States v. Arvizu* (2002) 534 U.S. 266, 273 [151 L.Ed.2d 740, 749] [in making a reasonable suspicion determination, a court must look at the totality of the circumstances in each case].) A detention is reasonable under the Fourth Amendment when the detaining officer can point to specific and articulable facts that, considered in light of the totality of the circumstances, would cause any reasonable officer in a like position to suspect that the person detained may be involved in criminal activity. (*Terry v. Ohio* (1968) 392 U.S. 1, 20-22 [20 L.Ed.2d 889, 905-906]; *People v. Souza* (1994) 9 Cal.4th 224, 231.) " 'In reviewing the propriety of an officer's conduct, courts do not have available empirical studies dealing with inferences drawn from suspicious behavior, and we cannot reasonably demand scientific certainty from judges or law enforcement officers where none exists. Thus, the determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior.' [Citation.]" (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 146.)

Goncalves pointed to specific facts that, considered with the rational inferences therefrom and all of the circumstances, gave rise to a reasonable suspicion that defendants may have been involved in the reported home invasion robbery and assault.[4] Hines attacks the testimony of Goncalves as dubious, insubstantial and contradictory to that of Wallace. But where, as here, the trial court held an evidentiary hearing pursuant to section 1538.5 and had an opportunity to observe the witness's demeanor, we do not substitute our judgment for the credibility determinations of the trial court, reweigh the evidence, draw inferences other than those reasonably drawn by the trial court, or resolve factual conflicts. (*People v. Martin* (1973) 9 Cal.3d 687, 692 [all factual conflicts must be resolved in the manner most favorable to the trial court's disposition]; *People v. Lewis*

---

[4] Byrd concedes that officers had reasonable suspicion to stop defendants for investigation and questioning.

(1982) 133 Cal.App.3d 317, 323.) The trial court's findings are supported by Goncalves's testimony at the suppression hearing.

Goncalves and Wallace responded to a call concerning a large group of Black males who broke into the victims' house and attempted to sexually assault Daughter. Based on his 15 years of experience as a law enforcement officer and the nature of the crimes reported, Goncalves believed the perpetrators would be between 15 and 27 years of age. Officers were informed that the suspects were on foot and headed toward Stockton Boulevard. Goncalves expected the suspects to split up.

Defendants fit the general description of the suspects provided to law enforcement authorities (Black adult males), and appeared to be in the age range Goncalves believed would have committed a sexual assault. This factor is notably missing in *People v. Perrusquia* (2007) 150 Cal.App.4th 228, 234, a case Ellington relies upon. Goncalves saw defendants walking along Stockton Boulevard, the street where the perpetrators had reportedly fled. Unlike the case in *In re Tony C.* (1978) 21 Cal.3d 888, which Hines cites, officers saw defendants within minutes of the reported crimes for which defendants were stopped. Defendants were in the vicinity of the victims' house close in time after the perpetrators' flight from the scene.

Goncalves noted that defendants were walking together in a group.[5] This fact raised Goncalves's suspicion because he was looking for a large group of Black males. Also, while there were other people on the street, according to Goncalves, defendants

---

[5] Although there is disagreement in the testimonies of Goncalves and Wallace about how many groups of people were walking along Stockton Boulevard and the size of any groups observed, both agreed defendants were in what appeared to be a group of three or four. The trial court credited Goncalves's testimony that defendants walked in a group of four. We defer to the trial court's credibility determination and resolution of factual conflicts. (*People v. Weaver* (2001) 26 Cal.4th 876, 924; *People v. Oldham* (2000) 81 Cal.App.4th 1, 9; *People v. Lewis, supra,* 133 Cal.App.3d at p. 323.)

were the only ones walking in a group. In Goncalves's experience, it was unusual for four people to walk in a group at that hour on a Monday night.

Goncalves's suspicions were also aroused because defendants appeared to deliberately ignore passing patrol cars, which had their lights and sirens activated. In Goncalves's experience, people who recently committed a crime purposefully avoid contact with law enforcement officers. (*United States v. Arvizu, supra,* 534 U.S. at pp. 270, 275-277 [151 L.Ed.2d at pp. 748, 751-752] [experienced border patrol agent's suspicion of criminal activity, based in part on the fact that defendant did not look at the agent as defendant's van passed the agent's vehicle and defendant seemed to be trying to pretend that the agent was not there, was entitled to some weight in assessing whether there was reasonable suspicion to justify an investigatory stop].) Goncalves said that people tend to look at patrol cars as they pass with their lights and sirens activated, and on several occasions Goncalves stopped individuals who appeared to deliberately avoid contact with officers and found such persons directly related to the crime under investigation. Goncalves found defendants' conduct suspicious.

With respect to Hines, Goncalves had identified Hines as a person of interest based on Goncalves's observations about the group of four. As Goncalves made a U-turn to contact the group, Hines crossed the street and walked in the opposite direction. This conduct raised Goncalves's interest further. Additionally, Gorham observed other facts that made him decide it was appropriate to detain Hines. Hines walked at a fast pace away from Goncalves and Wallace and was in the vicinity of the victims' house. (*People v. Letner and Tobin, supra,* 50 Cal.4th at p. 147 [attempt to avoid contact with police can contribute to reasonable suspicion]; *People v. Souza, supra,* 9 Cal.4th at p. 235 [flight from approaching police officers is a key factor in determining whether the police have sufficient cause to detain].) Hines matched the general description of the suspects. He acted as if nothing was going on even though everyone else in the area watched the passing patrol cars. And when Gorham contacted him, Hines was evasive, appeared very

17

nervous, and made an apparently untruthful statement about where he was going. (*Illinois v. Wardlow, supra,* 528 U.S. at p. 124 [145 L.Ed.2d at p. 576] [suspect's nervous and evasive behavior is a pertinent factor in determining reasonable suspicion].)

While there may have been innocent explanations for each of the observations made by the officers, "the possibility of innocent explanations for the factors relied upon by a police officer does not necessarily preclude the possibility of a reasonable suspicion of criminal activity." (*People v. Letner and Tobin, supra,* 50 Cal.4th at p. 146; *United States v. Arvizu, supra,* 534 U.S. at pp. 274-277 [151 L.Ed.2d at pp. 750-752].) " ' "Indeed, the principal function of [police] investigation is to resolve that very ambiguity and establish whether the activity is in fact legal or illegal . . . ." [Citation.]' " (*People v. Letner and Tobin, supra,* 50 Cal.4th at p. 148.) The officers' observations, based on their experience in law enforcement, are entitled to weight in our determination. (*United States v. Arvizu, supra,* 534 U.S. at pp. 274-277 [151 L.Ed.2d at pp. 750-752].)

We conclude that the trial court correctly denied defendants' section 1538.5 motion because the totality of the circumstances at the time of defendants' detention, viewed objectively, reasonably justified detaining defendants for investigative purposes.

B

Hines also argues that the trial court erred in finding the following facts when it denied defendants' suppression motion: (1) defendants conceded they were detained for the purpose of an in-field identification; (2) the suspects fled in the direction of Stockton Boulevard; (3) one of the suspects separated from the group, which enhanced the officers' suspicion; and (4) Ellington, Johnson and Byrd were handcuffed because of a concern about officer safety.

As we have stated, in a proceeding under section 1538.5, "the power to judge the credibility of the witnesses, resolve any conflicts in the testimony, weigh the evidence and draw factual inferences, is vested in the trial court. On appeal all presumptions favor the exercise of that power, and the trial court's findings on such matters, whether express

18

or implied, must be upheld if they are supported by substantial evidence." (*People v. Lawler* (1973) 9 Cal.3d 156, 160.)

The trial court's statement that defendants conceded they were detained for the purpose of an in-field identification is supported by the declaration of Ellington's defense counsel. Counsel averred that Ellington was detained for the purpose of an in-field identification. Johnson, Hines and Byrd joined in Ellington's section 1538.5 motion. There is no error in this challenged finding.

The record also supports the trial court's finding that the suspects "fled . . . in the direction of Stockton and--the intersection of Stockton Boulevard and Fruitridge Road, which was approximately a quarter to a half mile away. [¶] That's where the suspects, the defendants, were first observed by the officers." Goncalves and Wallace testified that when they first observed defendants, defendants were walking along Stockton Boulevard near Fruitridge Road, which, according to Goncalves, was between a quarter to half of a mile from the location of the reported crimes. The trial court's statement that the suspects fled in the direction of Stockton Boulevard is supported by the testimonies of Goncalves and Gorham, who said they were informed the suspects fled down Gordon Drive, toward Stockton Boulevard. Sacramento County Sheriff's Department dispatcher Gina Simonsa also testified that the suspects reportedly fled toward Stockton Boulevard.

Hines asserts the trial court's finding is erroneous because a person travelling eastbound on Gordon Drive is heading in the opposite direction of the intersection of Stockton Boulevard and Fruitridge Road, where defendants were detained. Our review of the map of the area that is in the appellate record does not substantiate this assertion.

Hines further contends that Goncalves had no information indicating that the suspects turned north onto Stockton Boulevard. We agree the record contains no evidence that such information was relayed to officers. But the trial court did not find that officers were advised that the suspects turned north onto Stockton Boulevard. Instead, the trial court credited Goncalves's judgment that the suspects turned north onto

19

Stockton Boulevard from Gordon Drive. This finding is supported by Goncalves's testimony that he was informed the suspects fled toward Stockton Boulevard, he saw defendants walking northbound on Stockton Boulevard, and he believed defendants were involved with the reported crimes.

Hines also challenges the trial court's finding that "before the detention, one suspect broke off from the others, which the officers regarded as enhancing their suspicion . . . ." Hines points out that Goncalves testified it was not significant to him that Hines broke away from the other defendants. However, Hines ignores Goncalves's subsequent statement that he was "definitely interested" in Hines because Hines was part of the group of four that he observed. Goncalves said he suspected the group might be involved in the reported crimes, and the fact that Hines distanced himself from the group when Goncalves made a U-turn to contact the group raised Goncalves's interest. The trial court reasonably inferred from this evidence that Goncalves's suspicion was enhanced when Hines separated himself from the other defendants.

As for the trial court's finding that *both* Goncalves and Wallace regarded the fact that Hines separated from the other defendants as enhancing *their* suspicion, Hines points out that Wallace did not see a suspect break away from a group. We agree there is no testimony from Wallace to this effect and the trial court erroneously attributed the testimony about one suspect separating from the group to both Goncalves and Wallace. Nonetheless, Wallace said it was unusual to see a group of people walking together on Stockton Boulevard shortly after the 911 call about a large group of perpetrators. What Wallace observed was sufficient for him to agree that it was appropriate to contact defendants. Hines fails to demonstrate that the trial court's error required a different result with regard to his suppression motion where Goncalves's testimony supported the finding that Hines's conduct contributed to the suspicion that Hines may be involved in criminal activity.

20

Substantial evidence also supports the inference by the trial court that handcuffing defendants was justified by a concern for officer safety. As we have explained, when Goncalves and Wallace initiated the stop, there were only two officers confronting three adult male subjects. Officers were informed that possibly 10 armed subjects were involved in a recent violent crime and the suspects ran from the scene. In addition, the stop occurred in a high crime area, and according to Goncalves and Gorham, there were people in the area watching the police activity, which may have heightened the possible danger to the officers. While there is no testimony about why defendants were immediately handcuffed, the trial court could have reasonably inferred from the testimony by Goncalves, Wallace and Gorham that, under the circumstances, the use of handcuffs was related to a concern about officer safety.

## II

Hines raises an ineffective assistance of counsel claim based on alleged inconsistencies in Goncalves's testimony at the hearing on defendants' section 1538.5 motion and at trial. The alleged inconsistencies concern defendants' location when Goncalves first observed them and the statement by Goncalves that he could see defendants avoid making eye contact with passing patrol cars.

At the hearing on defendants' section 1538.5 motion, Goncalves testified that he first saw four subjects walking northbound on Stockton Boulevard toward Fruitridge Road, "[p]robably a hundred yards" south of the intersection of Stockton Boulevard and Fruitridge Road. Goncalves did not say that the subjects were at the corner of Stockton Boulevard and Fruitridge Road when he first saw them as Hines claims. Goncalves's trial testimony about where the subjects were located when he first noticed them is consistent with his section 1538.5 hearing testimony. Goncalves said at trial that he first saw the four subjects walking along the sidewalk on northbound Stockton Boulevard toward Fruitridge Road, parallel to the Rite Aid drug store building. He explained that the individuals he detained continued walking to the corner as he drove past them and

21

made a U-turn, and he detained them at the corner. Hines does not provide a record cite showing that the Rite Aid building is not roughly 100 yards south of the intersection of Stockton Boulevard and Fruitridge Road.

We also discern no inconsistency in Goncalves's pretrial and trial testimony about whether he saw defendants avoid eye contact with passing patrol cars. At the pretrial hearing, Goncalves said the subjects did not look at passing patrol cars. In Goncalves's opinion, the subjects purposefully avoided making eye contact with the patrol cars driving past them. At trial, while Goncalves admitted he could not see the whites of the subjects' eyes, he stated that he did not see the subjects turn their heads to look at the passing patrol cars. The subjects looked "in a forward direction, not looking at anything else." Based on his experience, it appeared to Goncalves that the subjects were intentionally avoiding notice by law enforcement officers.

We reject Hines's ineffective assistance of counsel claim because he fails to demonstrate any asserted inconsistency in Goncalves's pretrial and trial testimony. As for any inconsistency between the testimony of Goncalves and another officer, it is not our function to determine the credibility of witnesses or to resolve conflicts in the testimony. (*People v. Lawler, supra,* 9 Cal.3d at p. 160; *People v. Simmons* (1971) 19 Cal.App.3d 960, 964.) We decline Hines's invitation to find that alleged inconsistencies in the trial testimony of Goncalves, Wallace and Gorham cast doubt on the trial court's 1538.5 ruling because we do not rely on evidence presented at trial to review the propriety of a pretrial section 1538.5 order. (*People v. Fiscalini, supra,* 228 Cal.App.3d at p. 1644, fn. 5; *People v. Neighbours, supra,* 223 Cal.App.3d at p. 1118.)

### III

Hines and Ellington further argue that the trial court's denial of their motion to bifurcate the trial of the gang enhancement (§ 186.22, subd. (b)(1)) resulted in a denial of

due process and a fair trial.  We address Ellington's claim separately because his bifurcation motion was made at his second trial.

A

The prosecution sought to admit gang evidence in the first trial to establish the gang enhancement allegations against Hines, Byrd and Ellington.  Hines moved to bifurcate the trial of the gang enhancement, and requested an Evidence Code section 402[6] hearing in relation to the proposed testimony by gang expert Brandon Luke.  Hines conceded that gang evidence was relevant to the gang enhancement, but argued that such evidence was extremely prejudicial and constituted improper character evidence.

Following an Evidence Code section 402 hearing at which Detective Luke was the sole witness called, the trial court denied the defense motion to bifurcate.  It found the proposed testimony by Luke was probative of motive, identity and the aiding and abetting theory of the charged offenses, and Luke's testimony was not more inflammatory than the evidence relating to the charged crimes.  The trial court also determined substantial evidence supported the charged offenses such that the evidence supporting the gang enhancement would not overwhelm an otherwise weak case and cause the jury to convict based solely on the gang evidence.  Hines now assigns various errors to the denial of his bifurcation motion.

We review a trial court's bifurcation decision under the deferential abuse of discretion standard.  (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1050-1051

---

[6] Evidence Code section 402 provides:  "(a) When the existence of a preliminary fact is disputed, its existence or nonexistence shall be determined as provided in this article.  [¶] (b) The court may hear and determine the question of the admissibility of evidence out of the presence or hearing of the jury; but in a criminal action, the court shall hear and determine the question of the admissibility of a confession or admission of the defendant out of the presence and hearing of the jury if any party so requests.  [¶]  (c) A ruling on the admissibility of evidence implies whatever finding of fact is prerequisite thereto; a separate or formal finding is unnecessary unless required by statute."

23

(*Hernandez*).) Hines and the Attorney General agree that our review must be based on the record before the trial court at the time of its ruling. (*People v. Catlin* (2001) 26 Cal.4th 81, 110 [motion to sever].) Hines bears the burden of clearly establishing a substantial danger of undue prejudice to him in conducting a unitary trial. (*Hernandez, supra,* 33 Cal.4th at p. 1051.)

While gang evidence carries a potential for prejudice (*People v. Albarran* (2007) 149 Cal.App.4th 214, 223 (*Albarran*)), the California Supreme Court has explained that a "criminal street gang enhancement is attached to the charged offense and is, by definition, inextricably intertwined with that offense." (*Hernandez, supra,* 33 Cal.4th at p. 1048.) "Evidence of the defendant's gang affiliation--including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like--can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime. [Citations.] To the extent the evidence supporting the gang enhancement would be admissible at a trial of guilt, any inference of prejudice would be dispelled, and bifurcation would not be necessary. [Citation.]" (*Id.* at pp. 1049-1050.)

Here, as the trial court found, gang evidence was admissible at the trial of the substantive offenses because it is relevant to prove a motive for the charged crimes, defendants' identities as the perpetrators of these crimes, and aiding and abetting liability. In other words, gang evidence is not relevant to the gang enhancement only.

A trial court does not abuse its discretion by denying the bifurcation of a gang enhancement when gang evidence reveals a motive behind a crime committed by gang members. (*Hernandez, supra*, 33 Cal.4th at pp. 1051, 1053; see generally *People v. Carter* (2003) 30 Cal.4th 1166, 1194-1196; *People v. Williams* (1997) 16 Cal.4th 153, 193-194; *People v. Memory* (2010) 182 Cal.App.4th 835, 858 (*Memory*); *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1167-1168; *People v. Martinez* (2003) 113 Cal.App.4th 400, 413; *People v. Funes* (1994) 23 Cal.App.4th 1506, 1518; *People v.*

24

*Olguin* (1994) 31 Cal.App.4th 1355, 1369-1370.) While the prosecution is not required to prove a motive for the charged crimes, motive is relevant to a defendant's guilt or innocence of those crimes. (*Hernandez, supra*, 33 Cal.4th at p. 1053; *People v. Bordelon* (2008) 162 Cal.App.4th 1311, 1321.)

Unlike *Albarran, supra*, 149 Cal.App.4th 214, a case Hines relies upon, the prosecution in this case presented evidence of gang motive. The prosecution claimed that defendants were members of the Ridezilla gang and they targeted the victims' house because they believed a drug dealer lived there. The prosecution made an offer of proof at the Evidence Code section 402 hearing that Mother and Daughter reported several occasions wherein strangers came to their house and asked for drugs. One reasonable inference from this proffered testimony is that the victims' house was reputed to be a drug dealer's house. Luke's testimony at the Evidence Code section 402 hearing explained why defendants would attack a house that was reputed to be a drug dealer's house. Luke opined that defendants were members or associates of Ridezilla and Ridezilla targeted drug dealers to get money and respect for the gang and to control and expand the gang's territory.[7] He said most gang members knew where drug dealers conducted business. Luke's explanation is consistent with the preliminary hearing evidence that several males, all carrying guns, rushed into the victims' house, referred to each other as "Blood," and repeatedly asked Daughter where the money was, suggesting that they expected to find money in the house and appeared ready to meet a show of

---

[7] Hines challenges the basis for Luke's opinion that the attack against the victims' house was a drug "ripoff" on the ground that the opinion was based on the asserted fact that several individuals inquired about buying crack at the victims' house. While we found no evidence in the record relating to inquiries about crack, an offer of proof was made to the trial court that Mother and Daughter reported that strangers came to their home and asked for drugs. Luke's testimony that Ridezilla targeted drug dealers was not limited to drug dealers who sold cocaine.

lethal force.[8]  Bifurcation would have denied the prosecution the ability to present evidence of a motive for the charged crimes.

While Luke did not provide the details of cases where Ridezilla members committed drug "ripoffs," he explained that drug dealers did not report crimes to law enforcement authorities.  Luke had been a sworn peace officer for 14 years.  He worked as an undercover officer for seven years, purchasing narcotics from street level dealers, some of whom were gang members.  He had daily contact with members of Black gangs and spoke with gang members and victims of gang crimes about gang culture and activities.  At the time of the evidentiary hearing, he had been a gang detective, assigned to Black gangs in Sacramento County, for four years.  Prior to this assignment, he worked as a patrol officer and then a problem-oriented police officer and responded to gang-related crimes.  He discussed gang trends and activities with other law enforcement officers, attended conferences on these subjects, and reviewed reports of gang-related cases and contacts by other officers.  He was familiar with the Ridezilla gang from his 15 to 20 direct contacts with Ridezilla members, investigation of crimes involving Ridezilla members, and review of reports by and discussions with other officers about Ridezilla and its activities.  Luke's testimony laid sufficient foundation for his opinion that Ridezilla targeted drug dealers.  (*People v. Gardeley* (1996) 14 Cal.4th 605, 618-620 [gang expert may rely on conversations with gang members, information from other law enforcement officers and agencies, and personal investigations of gang-related crimes];

---

**8**  Hines argues that Luke's testimony concerning the motive for the charged crimes is inadmissible because it is testimony about the subjective knowledge and intent of the perpetrators.  This claim is forfeited because Hines did not object on such ground at the Evidence Code section 402 hearing.  (*People v. Valdez* (1997) 58 Cal.App.4th 494, 505; *People v. Gutierrez* (1993) 14 Cal.App.4th 1425, 1434.)  Before Luke testified, Hines's counsel said any testimony by Luke about what a gang member was thinking would be inadmissible.  However, Hines did not raise the objection during Luke's testimony or during argument before the trial court ruled on the defense bifurcation motion.

*People v. Duran* (2002) 97 Cal.App.4th 1448, 1463, 1465 [finding gang expert's testimony about gang's primary activities, which was based on conversations with gang members, personal investigation of crimes committed by gang members, and information obtained from colleagues, sufficient to prove the primary activity element of a section 186.22 allegation]; *People v. Hill* (2011) 191 Cal.App.4th 1104, 1121-1122.)

Luke also testified at the Evidence Code section 402 hearing that individuals gain stature within the gang by committing crimes. In fact, members are expected to be active in the gang and its activities and to support fellow gang members. Members who do not "represent[]" the gang become targets. This testimony is probative of defendants' mental state and might explain why defendants committed or helped to commit the charged offenses. (*People v. Zepeda* (2001) 87 Cal.App.4th 1183, 1207-1209 [gang expert may testify that shooting could be motivated by desire to bolster the shooter's reputation within the gang and the gang's notoriety in the community].)

Gang evidence is also relevant to defendants' identities as perpetrators of the charged crimes, a critical issue in the case. Evidence that Ridezilla targeted drug dealers is relevant to identity because, as we explained, the prosecution claimed that defendants were members of Ridezilla and the burglary of the victims' house was a planned "drug ripoff." During the incident, the intruders referred to each other as "Blood." Luke explained that defendants' gang was primarily a Bloods clique, and Bloods gang members referred to each other as "Blood" during the commission of crimes to conceal their names. Luke's testimony about prior police contacts and the photographs retrieved from Hines's cell phone showed defendants' connection with the Bloods gang and the prior association between Hines, Ellington and Johnson, who were found walking together in close proximity to the victims' house minutes after Daughter reported that a group of intruders fled from the house. Evidence concerning defendants' identities as the perpetrators of the charged crimes bolstered the evidence presented at the preliminary

27

hearing that Daughter identified defendants as her attackers, which identification defendants vigorously challenged.

Gang evidence is also relevant to the prosecution's aiding and abetting theory. Luke testified that the primary activity of Ridezilla was the commission of certain crimes, and gang members were expected to participate in crimes and to support fellow gang members. Luke described crimes committed by two or more Ridezilla members acting together. He opined that Ridezilla members committed the charged crimes for the benefit of the gang. Evidence of gang culture and activity and the prior association between defendants tended to prove the prosecution's claim that if a defendant was not a direct perpetrator, he knew his fellow gang members intended to commit the charged offenses, he intended to assist in the commission of such offenses, and he did, in fact, assist the commission of the offenses. (*Hernandez, supra*, 33 Cal.4th at p. 1051 [testimony about alliances between two gangs was relevant to motive and intent behind robbery because it explained why defendants acted together to commit the crime]; *People v. Burnell* (2005) 132 Cal.App.4th 938, 947 [gang evidence was relevant to aiding and abetting and conspiracy theories].)

Hines states the evidence presented at the preliminary hearing showed that Johnson and Ellington did not personally commit any sexual offense, but could have been liable for such crimes under the natural and probable consequences doctrine. Hines goes on to argue that gang evidence was cumulative and "added little to further the prosecutor's objective" because it provided no additional support for holding Johnson and Ellington criminally liable for a sexual offense under the natural and probable consequences doctrine. We are not persuaded by this argument. The prosecution relied on the direct aiding and abetting theory of liability. As we have explained, the proposed gang evidence is probative of whether those defendants who did not personally commit a charged offense are nevertheless liable as aiders and abettors because they knew of the direct perpetrator's unlawful intent, intended to assist in achieving those unlawful ends,

28

and did in fact assist in committing the crime. (*People v. Perez* (2005) 35 Cal.4th 1219, 1225.)

Even if some of the evidence supporting the gang enhancement would be inadmissible at a trial of the charged crimes, a trial court may still deny bifurcation. (*Hernandez, supra,* 33 Cal.4th at p. 1050.) Conservation of judicial resources is a countervailing factor which may be considered in ruling on a motion to bifurcate. (*Ibid.*) Here, if the gang enhancement had been bifurcated, the witnesses, other than Luke, who testified about gang involvement--Daughter, Son, Mother, their neighbor, and Deputy Brett Schannep--may have been required to return to testify and be subjected a second time to cross-examination by four defense attorneys. Such a procedure would not have helped conserve judicial resources.

When gang evidence is relevant to the gang enhancement only, bifurcation is warranted if the gang evidence is unduly prejudicial. (*Hernandez, supra,* 33 Cal.4th at pp. 1049, 1051.) But Hines fails to show undue prejudice. There is no danger of undue prejudice with regard to three of the predicate crimes about which Luke testified because Hines was not involved with those crimes. (*People v. Funes, supra*, 23 Cal.App.4th at p. 1519 [evidence of prior gang conduct not involving defendant was less prejudicial to defendant].) And there is no evidence that Hines was responsible for the death of the victim of the fourth predicate crime. (*Hernandez, supra*, 33 Cal.4th at p. 1050 [whether defendant may have escaped punishment for an uncharged offense is a relevant factor in deciding the propriety of bifurcation decision].) Hence, evidence of the predicate crimes did not pose a substantial danger of swaying the jury to convict Hines regardless of whether he committed the charged crimes.

Further, nothing in Luke's testimony about the circumstances leading to the conviction of other Ridezilla members for the four predicate offenses and about prior police contacts with defendants indicates that such evidence is unduly prejudicial in comparison to the facts of the group home invasion robbery, attempted rape of Daughter,

and armed assault of Son such that the uncharged gang conduct would influence the jury to convict Hines regardless of his guilt. We do not concur with Hines's attempt to downplay the harm inflicted upon Daughter and her family or the statement that no one was wounded as a result of defendants' crimes.

We also do not agree with Hines that the trial court applied an incorrect standard in assessing prejudice. The trial court, in considering the inflammatory nature of the underlying charged crimes in relation to the gang enhancement, said: "I can't say that there is any difference between the two. The charges and the evidence that appears to support those charges indicate that it was a horrible crime and probably has an equivalent inflammatory allegation when you compare that the crime was committed by people for the benefit of a criminal street gang so that factor, I don't think, militates in favor of bifurcation." The trial court added, "I do not feel that the gang expert's testimony is of such a nature that it would inflame the jury and cause the jury to convict purely as an emotional response to the gang testimony. That would be what is meant by *prejudicial*. [¶] I think the gang expert's testimony has incriminating value. Certainly there is a prejudicial aspect. There is an aspect of the gang testimony that would tend to evoke an emotional response, but that same thing exists with respect to the underlying charges." The trial court properly considered whether the gang evidence was unduly prejudicial. (*Hernandez, supra,* 33 Cal.4th at pp. 1049, 1051.)

Citing *Memory, supra,* 182 Cal.App.4th 835, Hines urges that admission of gang evidence created a risk the jury would infer that he had a criminal disposition and was, therefore, guilty of the charged offenses. Evidence of a defendant's criminal disposition is inadmissible to prove he committed a specific criminal act. (Evid. Code, § 1101.) However, *Memory* is factually distinguishable. In *Memory*, gang-type evidence of the Jus Brothers motorcycle club, of which the defendants in that case were members, was offered to show a motive for the defendants' conduct during a fight resulting in the stabbing death of a victim and the stabbing of two others. (*Memory, supra,*

30

182 Cal.App.4th at p. 858.) The prosecution offered the gang-type evidence to prove that because the defendants were members of Jus Brothers, they were required to carry knives and fight when challenged. (*Ibid.*) But, unlike the case before us, there was no evidence in *Memory* to support the prosecution's claim about the group's practice. (*Id.* at pp. 858-860.) Without such evidence, evidence about the Jus Brothers allowed an unreasonable inference that the defendants had a criminal disposition to fight with deadly force when confronted. (*Ibid.*) As we have explained, the prosecution in this case presented evidence of gang motive.

In any event, there is no prejudice. The jury did not convict defendants of all charged offenses and did not find all of the enhancement allegations to be true, even though gang evidence was presented to it. Additionally, absent contrary indication, we presume the jury understood and followed the trial court's repeated instruction to consider evidence of gang activity for limited purposes only. (*People v. Yeoman* (2003) 31 Cal.4th 93, 139 ["Jurors are routinely instructed to make similarly fine distinctions concerning the purposes for which evidence may be considered, and we ordinarily presume they are able to understand and follow such instructions"]; *People v. Waidla* (2000) 22 Cal.4th 690, 725 ["The presumption is that limiting instructions are followed by the jury"]; *People v. Mickey* (1991) 54 Cal.3d 612, 689, fn. 17 ["The crucial assumption underlying our constitutional system of trial by jury is that jurors generally understand and faithfully follow instructions"].) The trial court expressly told the jury it may not conclude from the gang evidence that a defendant was a person of bad character or that he had a disposition to commit crime.

Regardless of the gang evidence, the evidence establishing Hines's guilt was strong. Mother and Daughter identified Hines as one of the perpetrators. Mother said she definitely recognized Hines's face. Daughter told deputies she was 100 percent sure Hines was one of the intruders. Mother and Daughter did not waver at trial in their certainty about Hines's identity as one of the intruders. Hines was found in Johnson and

31

Byrd's company in the vicinity of the victims' house minutes after Daughter reported the crimes. Physical evidence obtained at the victims' house tied Johnson to the charged crimes. Further, Daughter specifically recalled the distinctive shoes worn by Byrd from the attack against her and she said Byrd was the man who tried to rape her. Thus, Hines fails to demonstrate harm.

B

Like Hines, Ellington claims the trial court abused its discretion by denying his motion to bifurcate the gang enhancement trial.

In moving to bifurcate the gang enhancement at his second trial, Ellington relied on Hines's bifurcation motion from the first trial. Ellington did not request an evidentiary hearing before the trial court ruled on his bifurcation motion. He argued the gang evidence was not relevant to guilt because there was insufficient evidence that the charged crimes were related to a "drug ripoff" or gangs, and any marginal purpose for presenting gang evidence was outweighed by the prejudice created by such evidence. Ellington also claimed bifurcation would result in a trial of only one day or less after a conviction.

The trial court denied Ellington's motion, finding that the probative value of the gang evidence outweighed its prejudicial effect and that CALCRIM No. 1403 was an appropriate limiting instruction. The trial court instructed the jury, pursuant to CALCRIM No. 1403, that it may consider evidence of gang activity only for the following limited purposes: whether Ellington acted with the intent and knowledge required for the gang enhancements; whether he had a motive to commit the charged crimes; whether he aided and abetted the charged crimes; to evaluate the credibility of a witness; and to consider the basis for an expert witness's opinion. The jury was instructed that it may not consider evidence of gang activity for any other purpose and may not conclude from this evidence that Ellington was a person of bad character or had a disposition to commit crimes.

Ellington contends on appeal that gang evidence has marginal or no relevance to issues of motive and identity. Not so. At Ellington's retrial, the prosecution claimed that Ellington was a member of the Ridezilla gang and he and his fellow gang associates targeted the victims' house because they believed a drug dealer lived there. The prosecution further argued that Ellington aided and abetted the sexual assault committed by his fellow gang members. Like Hines, Ellington denied he was one of the perpetrators. Ellington claimed he did not aid and abet the charged crimes because he was not present during the commission of these crimes and, even if he was present, he had nothing to do with the charged sexual offenses. For reasons we have explained, gang evidence is admissible to prove motive, identity, and aiding and abetting liability. Accordingly, any inference of prejudice is dispelled and bifurcation is not required. (*Hernandez, supra*, 33 Cal.4th at pp. 1049-1050.)

The cases Ellington cites do not address bifurcation of gang enhancement allegations and are inapposite because in those cases gang evidence was not probative of identity or motive and the appellate court found the gang evidence should have been excluded under Evidence Code section 352 due to undue consumption of time, or a substantial danger of undue prejudice, confusing the issues or misleading the jury. (*People v. Cardenas* (1982) 31 Cal.3d 897, 904; *Memory, supra,* 182 Cal.App.4th at pp. 858-860; *Albarran, supra*, 149 Cal.App.4th at pp. 227-228; *People v. Maestas* (1993) 20 Cal.App.4th 1482, 1485, 1494-1498; *People v. Perez* (1981) 114 Cal.App.3d 470, 477-479.)

Ellington also claims evidence of the predicate offenses and the 2007 robbery and assault of Raven Lewis by Ellington and two Bloods gang members are inadmissible under Evidence Code section 1101, subdivision (b) to establish his identity as a

perpetrator of the charged crimes.[9] But the predicate offenses and the Lewis incident were not offered to show Ellington's identity as one of the perpetrators of the charged crimes. As Ellington's counsel pointed out, Luke's testimony about the predicate offenses showed that Ridezilla was a criminal street gang. The Lewis incident was offered to show that Ellington was an active Ridezilla member and that he committed the charged offenses for the benefit of the gang.

We also do not find persuasive Ellington's argument that the gang evidence was so unduly prejudicial as to sway the jury to convict him on counts one through four, but not so prejudicial as to compel the jury to also convict him on counts five and six. As for the predicate offenses, the danger of prejudice was not substantial because these crimes did not involve Ellington. However, even if some of the gang evidence might be excluded under Evidence Code section 352 as unduly prejudicial, a court may still deny bifurcation. (*Hernandez, supra*, 33 Cal.4th at p. 1050.) In addition, we are not convinced that a bifurcated proceeding would have resulted in judicial economy.

Hines and Ellington have not demonstrated error in the denial of their motions to bifurcate the trial of the gang enhancement.

### IV

Ellington contends the trial court erred in denying his motion to exclude Luke's testimony, at Ellington's retrial, about a 2007 attack upon Raven Lewis by a group including Ellington and two Bloods gang members.

Ellington made a pretrial motion to preclude Luke from testifying about the Lewis incident on multiple grounds: (1) the probative value of the evidence was substantially outweighed by the probability that its admission will necessitate undue consumption of

---

[9] Evidence that a person committed a crime or other act may be admissible when relevant to prove some fact (such as motive, intent, knowledge, or identity) other than criminal disposition. (Evid. Code, § 1101, subd. (b).)

time or create a substantial danger of undue prejudice, confusing the issues, or misleading the jury, (2) Luke's testimony was based on multiple hearsay and insufficient information, (3) the evidence was cumulative, and (4) the evidence was minimally relevant. The trial court held an evidentiary hearing to decide Ellington's objections.

Luke testified at the evidentiary hearing, based on the report of the investigating detective and Luke's conversation with that detective, that Ellington participated in the robbery and beating of Lewis in 2007. According to Luke, the incident began as an altercation between two groups, one including Lewis and another including the ex-girlfriend of Lewis's boyfriend. During the incident, Ellington and other males kicked Lewis while she was on the ground, and Ellington yelled, "This is Zilla, Bitch" while kicking Lewis. A female took Lewis's purse, which was next to Lewis in her car when the attack began, while the males beat Lewis. Lewis identified Ellington as one of her attackers by his moniker Zillamaine and his photograph. Lewis told authorities Ellington was a Ridezilla gang member. Lewis also reported that two of her attackers were Bloods gang members. The investigating detective's report verified that these two individuals were validated Bloods gang members.

The trial court denied Ellington's motion. It found Luke's testimony about the Lewis incident was based on sufficiently reliable and specific information and sources that were proper bases for expert opinion.

Ellington argues that evidence about the Lewis incident should have been excluded because it had the potential to confuse the jury. He claims Luke's testimony left the jury with the mistaken impression that Ellington robbed Lewis. We review the trial court's ruling for abuse of discretion. (*People v. Waidla, supra,* 22 Cal.4th at p. 724.)

Luke testified that, during the beating of Lewis, a female subject removed Lewis's purse from the seat of Lewis's car. There was no testimony that Ellington took Lewis's purse or that he knew someone intended to rob Lewis. We cannot discern from Luke's

35

testimony how the jury could have been confused about Ellington's role in the Lewis incident. While it is true that the prosecution said during its closing statement that Ellington robbed Lewis, that statement was brief and we presume the jury followed the trial court's instruction that what the attorneys said in closing arguments was not evidence. (*People v. Yeoman, supra,* 31 Cal.4th at p. 139; *People v. Waidla, supra,* 22 Cal.4th at p. 725; *People v. Mickey, supra,* 54 Cal.3d at p. 689, fn. 17.)

Ellington also claims Luke's testimony about the Lewis incident should have been excluded because the report upon which the testimony is based is too speculative and unreliable to support an expert opinion. But Luke's testimony about the Lewis incident does not show that the report is speculative or unreliable. The report appears to contain a sufficiently detailed, firsthand account of what happened during the attack by the victim, who personally knew Ellington and the other attackers.

Expert testimony may be based on matter made known to the expert at or before the hearing, including inadmissible hearsay, so long as the matter is of a type that is reasonably relied upon by experts in the particular field in forming their opinions. (Evid. Code, § 801, subd. (b); *People v. Catlin, supra,* 26 Cal.4th at p. 137; *People v. Gardeley, supra,* 14 Cal.4th at pp. 618-619.) Information obtained from other law enforcement officers and agencies is a commonly accepted basis for a gang expert's opinion testimony. (*People v. Gonzalez* (2006) 38 Cal.4th 932, 945; *People v. Gardeley, supra,* at pp. 619-620; *People v. Williams* (2009) 170 Cal.App.4th 587, 622; *People v. Martinez* (2008) 158 Cal.App.4th 1324, 1330-1331.) "And because . . . an expert witness [is permitted] to 'state on direct examination the reasons for his opinion and the matter . . . upon which it is based,' an expert witness whose opinion is based on such inadmissible matter can, when testifying, describe the material that forms the basis of the opinion." (*People v. Gardeley, supra*, 14 Cal.4th at p. 618.) It was proper for Luke to testify about the Lewis incident and to rely on the police report for the Lewis incident in rendering an expert opinion.

In addition, Ellington says evidence about the Lewis incident was unnecessary to the prosecution's case because there was other evidence linking Ellington to Ridezilla. As we have explained, the prosecution sought to admit the testimony about the Lewis incident to establish the gang enhancement allegation; in particular, that Ellington was an active member of Ridezilla. The Lewis incident showed that Ellington committed a crime in 2007 during which he announced his affiliation with Ridezilla. This evidence was not unnecessary to the prosecution's gang enhancement case because defense counsel suggested to the jury that Ellington did not commit the charged crimes for the benefit of the Ridezilla gang because he had no involvement with Ridezilla after 2005. The conclusion Ellington asked the jury to draw would have undercut the prosecution's gang enhancement case.

Ellington further claims that evidence concerning the Lewis incident should have been excluded as unduly prejudicial because, like the charged crimes against Daughter, the Lewis incident involved an assault of a woman. While both the charged crimes and the Lewis incident involve female victims, the Lewis incident does not involve a sexual offense and the prosecution did not claim that Ellington personally engaged in the assault, attempted rape or sexual battery of Daughter. The two incidents are not so similar as to create a risk of undue prejudice.

Under these circumstances, the trial court could have reasonably concluded that the probative value of the testimony about the Lewis incident outweighed any prejudice. Additionally, as instructed, the jury would have considered the Lewis incident for the limited purpose of evaluating Luke's opinion that Ellington was a Ridezilla gang member. The jury would not have considered the facts of the Lewis incident to determine that Ellington had a disposition for assaulting women.

V

Ellington challenges the denial of his motion to suppress the in-field identifications by Mother and Daughter. Ellington argues the show-ups were unduly suggestive and unreliable.

We review de novo the trial court's ruling on the constitutionality of an identification procedure and uphold the factual findings by the trial court if supported by substantial evidence. (*People v. Kennedy* (2005) 36 Cal.4th 595, 608–609, overruled on other grounds in *People v. Williams* (2010) 49 Cal.4th 405, 458–459; *People v. Contreras* (1993) 17 Cal.App.4th 813, 819.) A defendant challenging an identification procedure bears the burden of establishing (1) that the procedure used is unduly suggestive and unnecessary, and (2) if so, that the identification by the witness is unreliable under the totality of the circumstances, taking into account such factors as the witness's opportunity to view the perpetrator at the time of the crime, the witness's degree of attention, the accuracy of the witness's prior description of the suspects, the level of certainty the witness demonstrated at the show-up, and the time between the crime and the show-up. (*People v. Ochoa* (1998) 19 Cal.4th 353, 412 (*Ochoa*).) The defendant must establish "unfairness as a demonstrable reality, not just speculation." (*People v. DeSantis* (1992) 2 Cal.4th 1198, 1222.) Our task is to determine whether there is a very substantial likelihood of irreparable misidentification under the totality of the circumstances to warrant reversal of the conviction. (*Manson v. Brathwaite* (1977) 432 U.S. 98, 104-107, 116 [53 L.Ed.2d 140, 147-149, 155]; *People v. Cunningham* (2001) 25 Cal.4th 926, 990.)

Ellington does not contend that the in-field show-ups were unnecessary. Such contention would have been meritless. As the trial court found, officers detained four subjects they suspected may have been involved in the reported crimes. An immediate show-up would allow officers to promptly release Ellington if witnesses did not identify him as one of the perpetrators and to quickly resume the search for the real perpetrators while they may still be in the area. (*People v. Cowger* (1988) 202 Cal.App.3d 1066,

38

1071-1072.)  Ellington, thus, cannot satisfy the first prong of the *Ochoa* test.  (*Ochoa, supra,* 19 Cal.4th at p. 412.)

Nonetheless, Ellington says the manner in which the show-ups were conducted was unduly suggestive.  He says Mother and Daughter viewed him after positively identifying two other suspects; therefore, Mother and Daughter were likely influenced by Ellington's association with the other defendants.  Ellington also complains that he was handcuffed, officers shined spotlights on him, and multiple patrol cars were present during the show-up.  But the procedures of which Ellington complains, while they may be suggestive, have been approved by courts.  (*Stovall v. Denno* (1967) 388 U.S. 293, 294, 296 [18 L.Ed.2d 1199, 1202-1203] [defendant was handcuffed to one of five police officers during the show-up]; *In re Carlos M., supra,* 220 Cal.App.3d at pp. 378, 386 [defendant was handcuffed when viewed by the victim and was shown immediately after the victim had positively identified another suspect]; *In re Richard W.* (1979) 91 Cal.App.3d 960, 969-970 [defendant sat handcuffed in the back of a police car, with officers standing around]; *People v. Craig* (1978) 86 Cal.App.3d 905, 914 [defendants were inside a police car and officers stood around the car]; *People v. Anthony* (1970) 7 Cal.App.3d 751, 759, 764 [officers drove defendant and his companion to the scene of the robbery in a marked police vehicle, handcuffed, and asked the witness " 'which was the one that came in' " and committed the robbery]; *People v. Gomez* (1976) 63 Cal.App.3d 328, 335-337 [defendant stood outside a patrol car, was handcuffed and accompanied by two officers].)

"[T]he mere presence of handcuffs on a detained suspect is not so unduly suggestive as to taint the identification." (*In re Carlos M.*, *supra*, 220 Cal.App.3d at p. 386.)  The use of spotlights made it possible for the witnesses to see Ellington in the dark.  Ellington fails to show that the use of spotlights was unduly suggestive.  Ellington was not required to wear a mask during the show-up, which would arguably be suggestive.  Mother and Daughter were admonished that the persons they would view

may or may not be the perpetrators and to not let the fact that the subjects were handcuffed affect their identification or their ability to keep an open mind. In addition, Mother and Daughter were taken to the detention site separately, and Mother did not speak with Daughter after Mother identified Ellington, eliminating the risk of any improper influence. In contrast, in *People v. Bisogni* (1971) 4 Cal.3d 582, 586 and *People v. Sandoval* (1977) 70 Cal.App.3d 73, 80, the cases Ellington compares to his, the first witness conferred with the second witness after making a positive identification.

Ellington also claims that Deputy Jack Noble influenced Daughter's identification by telling her the suspects "matched the description." An identification procedure violates due process protections when the state improperly suggests, in advance of the identification by the witness, the identity of the person suspected by the police. (*People v. Cunningham, supra,* 25 Cal.4th at p. 990; *In re Carlos M.*, *supra,* 220 Cal.App.3d at p. 387.) Noble told Daughter "there were some subjects that were detained that matched the description." The trial court did not find to the contrary. In any event, similar statements have been found not to violate due process. (*People v. Ballard* (1969) 1 Cal.App.3d 602, 605 [police told victim they had two suspects who " 'fit the description' " she had given them of the robbers]; *People v. Gomez, supra,* 63 Cal.App.3d at pp. 335-337 [victim was told there was a suspect the police wanted her to look at]; *People v. Contreras, supra,* 17 Cal.App.4th at pp. 817, 820 [officer said two suspects were in custody during the lineup]; but see *People v. Sandoval, supra,* 70 Cal.App.3d at p. 85 [finding statement by police officer to the victim that police would bring "the suspect" through the hallway improperly suggested that defendant was the perpetrator].) While Noble told Daughter that defendants "matched the description," he also admonished her that defendants may or may not be "involved in the incident" and to keep an open mind. In any event, anyone asked to view a show-up would naturally assume the police have a suspect. (See *People v. Avila* (2009) 46 Cal.4th 680, 699.) This circumstance does not render an identification procedure suggestive. (*Ibid.*) There is

nothing in the record to indicate that officers encouraged Daughter to identify Ellington as one of the perpetrators. And Mother, who was not admonished that Ellington matched the description of the perpetrators, also identified Ellington.

Even if the show-up had been impermissibly suggestive, the identifications by Mother and Daughter were sufficiently reliable for admission at trial under the totality of the circumstances. Ellington concedes the short duration between the crimes and the show-ups cuts against his claim that the show-ups are unreliable. That concession is proper and makes the delayed identification in *People v. Bisogni, supra,* 4 Cal.3d 582, a case Ellington relies upon, distinguishable. The identifications here were more likely to be accurate because they were conducted close in time to the crimes, when the witnesses' memory of what the suspects looked like was still fresh. (*In re Carlos M.*, *supra,* 220 Cal.App.3d at p. 387; *People v. Martinez* (1989) 207 Cal.App.3d 1204, 1219; *People v. Cowger*, *supra*, 202 Cal.App.3d at pp. 1071-1072.)

Mother and Daughter had an opportunity to view the suspects. Mother saw the suspects as she drove down a very long and narrow driveway. She took note of the suspects' clothing. Hence, at the show-up, she noticed that two of the defendants were not wearing the black hoodies she saw the suspects wearing earlier that evening. Mother recognized Ellington's sweater and was sure he was one of the individuals she saw walking down her driveway, and she remembered that Ellington pulled his sweater over the bottom of his mouth when she saw him on her driveway.

Daughter's assailants wore masks and while distraught, Daughter told the 911 operator she did not get a good look at her attackers because they were punching her in the eye. But Daughter observed the suspects for one to two minutes upon their entry into her home. She observed her attackers sufficiently to provide a general description of them (Black males in their 20's and of average build) and their clothing (dark, hooded sweatshirts and dark colored jeans) before the show-up. She had calmed down by the time of her show-up and was unequivocal in her identifications. She was "100 percent

41

certain" that Hines was the person who punched her in the face, was certain that Johnson was one of the persons who entered her house, and noted the distinctive shoes that Byrd wore. She also positively identified Ellington as one of the men who came into and ransacked her house. Although Daughter was injured, there is no evidence that her injuries prevented her from seeing Ellington at the show-up or remembering what her assailants looked like. Mother and Daughter separately identified Ellington as one of the culprits.

Viewing the totality of the circumstances, Ellington has not met his burden of establishing a substantial likelihood of misidentification.

VI

Ellington claims the trial court erred during his retrial by denying his section 1118.1 motion[10] regarding count five (assault with intent to commit rape), because there is insufficient evidence to support retrial on counts five and six (sexual battery). The Attorney General responds that because Ellington was not convicted of the crimes charged in counts five and six, his claim is not ripe for appeal and must be dismissed. We find merit in the Attorney General's position.

The right of appeal is statutory, and an appeal from any judgment or order must be expressly authorized by the Constitution or a statute. (*People v. Mazurette* (2001) 24 Cal.4th 789, 792; 6 Witkin & Epstein, Cal. Criminal Law (4th ed. 2012) Criminal Appeal, § 5, p. 270.) Section 1237 provides: "An appeal may be taken by the defendant:

---

[10] Section 1118.1 states: "In a case tried before a jury, the court on motion of the defendant or on its own motion, at the close of the evidence on either side and before the case is submitted to the jury for decision, shall order the entry of a judgment of acquittal of one or more of the offenses charged in the accusatory pleading if the evidence then before the court is insufficient to sustain a conviction of such offense or offenses on appeal. If such a motion for judgment of acquittal at the close of the evidence offered by the prosecution is not granted, the defendant may offer evidence without first having reserved that right."

[¶] (a) From a final judgment of conviction except as provided in Section 1237.1 and Section 1237.5. A sentence, an order granting probation, or the commitment of a defendant for insanity, the indeterminate commitment of a defendant as a mentally disordered sex offender, or the commitment of a defendant for controlled substance addiction shall be deemed to be a final judgment within the meaning of this section. Upon appeal from a final judgment the court may review any order denying a motion for a new trial. [¶] (b) From any order made after judgment, affecting the substantial rights of the party."

The jury did not reach a verdict on counts five and six against Ellington, and the trial court declared a mistrial on those counts. Therefore, there is no judgment on those counts for this court to review. Section 1237.1 (error in calculating presentence custody credits) and 1237.5 (appeal from conviction upon plea of guilty or nolo contendre or revocation of probation following an admission of violation) do not apply. It has also been held that an order denying a section 1118.1 motion for acquittal is not an appealable order. (*People v. Rocovich* (1969) 269 Cal.App.2d 489, 490; *People v. Aguilar* (1959) 174 Cal.App.2d 662, 663.)

Relying on *Richardson v. United States* (1984) 468 U.S. 317 [82 L.Ed.2d 242] (*Richardson*) and *People v. Hatch* (2000) 22 Cal.4th 260 (*Hatch*),[11] Ellington urges us to consider his claim on the merits rather than require him to wait for the People to refile charges against him and then seek relief by way of a petition for habeas corpus. In

---

[11] *Hatch, supra,* 22 Cal.4th 260, involved an appeal by the People of an order dismissing a case pursuant to section 1385 after a mistrial was declared when the jury deadlocked on all counts. (*Id.* at p. 266.) The trial court dismissed the case because it believed no reasonable jury would convict the defendant. (*Ibid.*) One of the issues before the California Supreme Court was whether a section 1385 dismissal for legal insufficiency was appealable under section 1238. Section 1238 authorizes an appeal by the people of enumerated orders, including a dismissal order. But the Supreme Court did not reach that issue. (*Id.* at pp. 267-268, 271, 276.)

*Richardson,* the defendant moved for a judgment of acquittal at the close of the prosecution's case on the ground that the government had failed to introduce sufficient evidence to warrant a finding of guilt beyond a reasonable doubt. (*Richardson, supra*, 468 U.S. at p. 318 [82 L.Ed.2d at p. 246].) The motion was denied. (*Ibid.*) The jury then acquitted the defendant on one count and was unable to reach a verdict on the other counts. (*Id.* at pp. 318-319 [82 L.Ed.2d at p. 246].) The trial court declared a mistrial and denied the defendant's renewed motion for a judgment of acquittal and motion to bar retrial based on the double jeopardy clause of the federal Constitution on insufficiency of the evidence grounds. (*Id.* at p. 319 [82 L.Ed.2d at pp. 246-247].) The appellate court dismissed the appeal from the rulings for lack of jurisdiction under Title 28 of the United States Code, section 1291, which provides for appeals from "final decisions." (*Ibid.* [82 L.Ed.2d at p. 247].) The United States Supreme Court, however, held that the collateral order exception to the requirement of a "final decision" in Title 28 of the United States Code, section 1291, permitted an interlocutory review of the double jeopardy claim asserted by the defendant; the defendant sought review of the sufficiency of the evidence at his first trial as a necessary component of his separate claim of double jeopardy. (*Id.* at pp. 320-322 [82 L.Ed.2d at pp. 247-249].)

*Richardson* is inapposite because Ellington does not raise a colorable double jeopardy claim and nothing in the record in this case shows that Ellington will be retried on count five or six. (*Richardson, supra*, 468 U.S. at p. 322 [82 L.Ed.2d at pp. 248-249].) The Supreme Court in *Richardson* held that the "trial court's declaration of a mistrial following a hung jury is not an event that terminates the original jeopardy to which [a defendant is] . . . subjected. The Government, like the defendant, is entitled to resolution of the case by verdict from the jury, and jeopardy does not terminate when the jury is discharged because it is unable to agree. Regardless of the sufficiency of the evidence at petitioner's first trial, he has no valid double jeopardy claim to prevent his retrial." (*Id.* at p. 326 [82 L.Ed.2d at p. 251], fn. omitted.) While the Supreme Court

44

found the defendant in *Richardson* had a colorable double jeopardy claim, the court said that, in light of its holding, claims of double jeopardy such as the defendant's would no longer be "colorable" double jeopardy claims which may be appealed before final judgment. (*Id.* at p. 326, fn. 6 [82 L.Ed.2d at p. 251, fn. 6].) Thus, even if the "collateral order" doctrine that permitted interlocutory review in *Richardson* is applicable here (*Ponce-Bran v. Trustees of Cal. State University* (1996) 48 Cal.App.4th 1656, 1661 [California standards for determining the appealability of collateral orders differ from the federal standards]; *Efron v. Kalmanovitz* (1960) 185 Cal.App.2d 149, 160–161 [" 'whether an appeal should be allowed, and if so, under what circumstances or on what conditions are matters for each state to determine for itself' [citation]"]), it does not permit review in this case.

## VII

Ellington also contends there is insufficient evidence that the charged offenses were committed "with the specific intent to promote, further, or assist in any criminal conduct by gang members."**12**

To determine whether sufficient evidence supports the jury's section 186.22, subdivision (b)(1) finding that Ellington intended to promote, further or assist in any criminal conduct by a gang member, "we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence--that is, evidence that is reasonable, credible, and of solid value--from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] We presume

---

**12** Section 186.22, subdivision (b)(1) requires proof that the defendant committed the charged offense with the intent to promote, further or assist in *any* criminal conduct by gang members, including the current offenses. (*People v. Albillar* (2010) 51 Cal.4th 47, 64-67 (*Albillar*).) Ellington concedes the California Supreme Court's decision in *Albillar* disposes of his argument that section 186.22, subdivision (b)(1) requires proof of specific intent to further or facilitate *other* criminal conduct. (*Id.* at pp. 65-66.)

every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.]" (*Albillar, supra,* 51 Cal.4th at p. 60.) We do not reweigh evidence or reevaluate the credibility of witnesses. (*Ibid.*)

Substantial evidence that a defendant intended to and did commit the charged offenses with known gang members supports the reasonable inference that the defendant had the specific intent to promote, further or assist criminal conduct by those gang members. (*Albillar, supra*, 51 Cal.4th at p. 68 [finding substantial evidence supporting specific intent element of gang enhancement where there was ample evidence that defendants were members of a criminal street gang, defendants intended to attack the victim, and they assisted each other in raping her].) Expert opinion can also support a section 186.22, subdivision (b)(1) enhancement. (*Albillar, supra*, 51 Cal.4th at p. 63; *Hernandez, supra,* 33 Cal.4th at pp. 1047-1048; *People v. Gardeley, supra,* 14 Cal.4th at p. 619.) Here, expert testimony, coupled with the other evidence presented, was sufficient to support the gang enhancement finding in counts one through four. To the extent Ellington claims there is insufficient evidence to support gang enhancement allegations attached to counts five and six, we do not consider the claim because the jury made no such findings.

Luke testified about the Ridezilla gang and defendants' active gang membership or association. Ellington did not challenge Luke's qualification to testify as a gang expert. Luke told the jury that defendants were active members or associates of Ridezilla at the time of the charged crimes. He testified about Ellington's prior association with validated Ridezilla gang members including Hines, prior contact with law enforcement authorities in Ridezilla territory, and involvement with the Lewis incident with Bloods gang members wherein Ellington called out "Zilla" as he kicked the victim. Luke also

46

testified about cell phone photographs of Ellington and Johnson throwing gang signs. These photographs showed prior and recent association between Hines, Ellington and Johnson.

Luke told the jury that gang members are expected to commit crimes to prove their loyalty to the gang. Members gain respect from fellow gang members, rivals and the community and stature within the gang from their participation in crimes. Gang members are expected to back fellow gang members, and failure to do so could result in negative consequences for the individual and the gang. According to Luke, gang members commit crimes together and with guns.

Luke said the commission of violent crimes by gang members benefits the gang because the members "represent[]" the gang in the neighborhood and the crimes add to the gang's notoriety. Each gang member "reflects that gang as a whole" and the respect a gang member earns is "passed back towards the gang." A home invasion robbery like the one in this case benefitted Ridezilla because it instilled fear in the victims and the neighborhood, and contributed to Ridezilla's notoriety. Luke also opined that a "drug rip-off" benefitted Ridezilla because it was a source of money and drugs for the gang and allowed Ridezilla to take over the drug dealer's territory. As we have discussed, there is evidence from which the jury could reasonably infer that the victims' house was a reputed drug dealer's house and it was targeted for that reason.

Evidence showed that defendants worked together to perpetrate the charged crimes. Byrd subdued and sexually assaulted Daughter while Ellington and the others ransacked the house. One of the intruders directed Byrd to "[s]trip the bitch," and Byrd followed the order to take Daughter upstairs. Together, defendants terrorized Daughter and Son. Daughter was violently and repeatedly hit, her clothes were removed, and she was sexually assaulted. Son was threatened at gunpoint.

During the crimes, the perpetrators used the term "Blood." For example, one of the intruders said "Hey, Blood, somebody's here." While the use of the term "Blood"

47

can have different meanings depending upon the circumstances , Luke said Bloods gang members call each other "Blood" during the commission of a crime to avoid revealing their names and to announce their gang affiliation. Son reportedly heard someone say "Where's the money, Blood? Where's the money, Blood?" Luke explained that when used in addressing the victim, the word "Blood" signals to the victim that a gang was committing the crime and intimidates victims not to report the crime to law enforcement. Daughter believed the intruders were gang members because of the way they were dressed, they said "Blood" a lot, and they were committing a home invasion robbery with guns. One reasonable inference from the evidence is that defendants used the word "Blood" to instill fear in their victims and to announce their gang affiliation.

The jury could have reasonably concluded from all of the evidence that Ellington intended to and did commit the charged crimes with known gang members. There was substantial evidence that Ellington intended to further, or assist his fellow gang members in committing, the crimes charged in counts one through four. (*Albillar, supra*, 51 Cal.4th at p. 68.)

The cases Ellington compares with this one are distinguishable. In *People v. Ramon* (2009) 175 Cal.App.4th 843, 847, 849, the appellate court reversed the true finding on the gang enhancement, finding no facts from which the gang expert could discern whether the defendant acted on his own behalf or on behalf of his gang. (*Id.* at pp. 851, 853.) And in *People v. Ochoa* (2009) 179 Cal.App.4th 650, the appellate court concluded there was insufficient evidence that the charged offenses were committed to benefit the defendant's gang because there was no evidence that the gang committed carjackings like the one committed by the defendant. (*Id.* at pp. 661-665.) There was no connection between the crimes and the defendant's gang, such as the defendant calling out a gang name or acting in the company of a fellow gang member. (*Ibid.*) Here, however, there was substantial evidence from which Luke based his expert opinion that the charged crimes were connected to the Ridezilla gang, namely the statements by

Mother and Daughter about possible drug activity by the former resident of their house; Daughter and Son's statements that the intruders repeatedly used the term "Blood" and expected to find money at the house; evidence about the Ridezilla gang, its culture and activities, including home invasion robberies and the robbery of drug dealers, defendants' gang-related tattoos, admission of gang membership, and/or prior associations or criminal activities with validated Ridezilla or Bloods gang members; and the fact that defendants were apprehended as a group in the vicinity of the victims' house close in time to the intruders' flight from the crime scene. The jury could reasonably find that a group of Ridezilla gang members or associates committed a "drug rip-off" and Ellington intended to aid the felonious conduct of his fellow Ridezilla gang members.

VIII

Ellington next claims that the trial court abused its discretion in admitting photographs obtained from the cell phones of Hines and Johnson. However, even if the trial court erred in admitting the cell phone photographs, there was no prejudice.

"The erroneous admission of gang or other evidence requires reversal only if it is reasonably probable that appellant would have obtained a more favorable result had the evidence been excluded." (*People v. Avitia* (2005) 127 Cal.App.4th 185, 194.) As we shall explain, there is no reasonable probability that Ellington would have obtained a more favorable result in the absence of the cell phone photographs because substantial evidence supports his conviction in counts one through four. Ellington matched the general description of the intruders provided by Daughter. He was positively identified by Mother and Daughter at the show-ups. Mother said at her show-up that she definitely saw Ellington on her driveway and remembered his sweater. Officers apprehended Ellington with his codefendants in the vicinity of the crime scene within minutes of Daughter's 911 call. Physical evidence tied Johnson to the crime scene, and Daughter recognized Byrd's distinctive shoes. Even without the challenged cell phone photographs, other substantial evidence showed the prior association between Hines and

49

Ellington, Hines and Johnson, and Johnson and validated Bloods gang member Danny Owens, defendants' active membership in a Bloods gang, and the access to guns and drugs by Ridezilla members such as Hines. Additionally, the cell phone photographs were not more inflammatory than the other gang evidence presented at trial and did not inflame the jury to convict Ellington on all counts.

IX

Ellington consented to instructing the jury with CALCRIM Nos. 370 (motive) and 1401 (crime committed for benefit of criminal street gang). Nonetheless, he claims on appeal that it was error to give both instructions because motive is an element of the gang enhancement allegation.[13]

Although Ellington failed to object below, we will consider his appellate contention because he asserts the trial court incorrectly instructed the jury on the elements of the gang enhancement. (*People v. Hillhouse* (2002) 27 Cal.4th 469, 503 [claim of instructional error with regard to elements of a crime require no objection at trial because such error affects the substantial rights of the defendant].)

Counts one through six asserted gang enhancement allegations against Ellington. Accordingly, the trial court instructed his jury, pursuant to CALCRIM No. 1401, as follows: "If you decide the defendant is guilty of any of the crimes charged in counts one through six[,] you must then decide whether for each crime the [P]eople have proved the additional allegation that the defendant committed that crime for the benefit of, at the direction of or in association with a criminal street gang. You must decide whether the [P]eople have proved this allegation for each crime and return a separate finding for each crime. [¶] To prove this allegation[,] the [P]eople must prove that, one, the defendant committed or attempted to commit the crime for the benefit of, at the direction of or in

---

[13] Ellington's opening brief erroneously states that count one alleges a section 190.2 gang special circumstance.

association with the criminal street gang and, two, the defendant intended to assist, further or promote criminal conduct by gang members.  [¶] . . . [¶]  The [P]eople have the burden of proving each allegation beyond a reasonable doubt.  [¶]  If the [P]eople have not met this burden, you must find that the allegation has not been proved."  (§ 186.22, subd. (b)(1).)

The trial court also instructed the jury, consistent with CALCRIM No. 370, that "[t]he People are not required to prove the defendant had a motive to commit any of the crimes charged.  In reaching your verdict you may, however, consider whether the defendant had a motive.  Having a motive may be a factor tending to show that the defendant is guilty.  Not having a motive may be a factor tending to show the defendant is not guilty."

Ellington concedes that the claim he makes was rejected in *People v. Fuentes* (2009) 171 Cal.App.4th 1133 (*Fuentes*).  In that case, the defendant was convicted of, among other things, criminal street gang participation.  (§ 186.22, subd. (a).)  Gang enhancement and gang special circumstance allegations (§ 190.2, subd. (a)(22)) were also found to be true.  (*Fuentes, supra,* 171 Cal.App.4th at pp. 1136-1138.)  The defendant argued that the CALCRIM No. 370 instruction given, which stated that motive need not be proved, conflicted with the jury instructions for the gang participation offense and the gang enhancement and special circumstance allegations, which required proof of intent to further gang activity.  (*Id.* at pp. 1139-1140.)  According to the defendant, this was because intent and motive were synonymous.  (*Ibid.*)  The appellate court rejected the defendant's argument, saying "[a]n intent to further criminal gang activity is no more a 'motive' in legal terms than is any other specific intent.  We do not call a premeditated murderer's intent to kill a 'motive,' though his action is motivated by a desire to cause the victim's death."  (*Fuentes, supra,* 171 Cal.App.4th at p. 1139.)

The distinction between motive and intent is well-settled.  (*People v. Hillhouse, supra,* 27 Cal.4th at p. 504; 1 Witkin & Epstein, Cal. Criminal Law (4th ed. 2012)

51

Elements, § 4, p. 263.)  Our Supreme Court has held that motive and intent are distinct mental states.  (*People v. Hillhouse, supra,* 27 Cal.4th at p. 504.)  "Motive describes the reason a person chooses to commit a crime.  The reason, however, is different from a required mental state such as intent or malice."  (*Ibid.*)  Ellington does not contend that any jury instruction given used the terms "intent" and "motive" interchangeably.  (*People v. Cash* (2002) 28 Cal.4th 703, 739 [where instructions as a whole did not use the terms "motive" and "intent" interchangeably, there was no reasonable likelihood the jury understood those terms as synonymous].)

The court in *Fuentes* concluded that the CALCRIM No. 370 instruction, in combination with the pattern instruction for section 186.22, subdivision (b)(1), told the jury the prosecution must prove that the defendant "intended to further gang activity but need not show what motivated his wish to do so.  This was not ambiguous and there is no reason to think the jury could not understand it.  [The defendant] claims the intent to further criminal gang activity should be deemed a motive, but he cites no authority for this position.  There was no error."  (*Fuentes, supra,* 171 Cal.App.4th at pp. 1139-1140.)  We agree with *Fuentes.*

Ellington argues that *Fuentes* was wrongly decided, but the holding of *Fuentes* is consistent with that in *People v. Hillhouse, supra,* 27 Cal.4th 469.  Like Ellington, the defendant in *Hillhouse* argued a jury instruction which stated that motive was not an element of the crimes charged and need not be proved contradicted instructions on the requisite mental states for the charged offenses.  (*Hillhouse, supra,* 27 Cal.4th at pp. 480, 503.)  The Supreme Court distinguished between intent and motive.  (*Id.* at pp. 503-504.)  It held that while malice and intent were elements of the charged offenses in that case, motive was not.  (*Id.* at p. 504.)  The analysis and holding in *People v. Wilson* (2008) 43 Cal.4th 1, 22, wherein the Supreme Court found no contradiction between the pattern instruction on motive and the pattern instruction describing the intent necessary for attempted robbery, is similar.  Both *Hillhouse, supra*, 27 Cal.4th at page 504 and *Fuentes,*

*supra,* 171 Cal.App.4th at page 1140 distinguished *People v. Maurer* (1995) 32 Cal.App.4th 1121, a case Ellington relies upon, as involving a unique statute.

The language of CALCRIM No. 370 also supports our conclusion. CALCRIM No. 370 refers to the "crimes charged," not to an enhancement allegation. "[A]ny reasonable juror would have understood the instruction as referring to [a] substantive offense only and not to any [enhancement] allegation." (*People v. Noguera* (1992) 4 Cal.4th 599, 637 [discussing the equivalent CALJIC instruction on motive]; *People v. Snow* (2003) 30 Cal.4th 43, 98 [also noting that the equivalent CALJIC instruction on motive refers to " 'the crime charged' " not to the special circumstance allegation].)

Ellington suggests that CALCRIM No. 370 unconstitutionally lessened the prosecution's burden of proof on the gang enhancement. But claims that CALCRIM No. 370 lightens the prosecution's burden of proof have been rejected. (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1094-1095 [discussing the equivalent CALJIC No. 2.51 instruction]; *People v. Prieto* (2003) 30 Cal.4th 226, 254; *Fuentes, supra,* 171 Cal.App.4th at p. 1139.)

Ellington further contends that the prosecutor equated motive with intent in his closing argument. But even if the prosecutor used the terms "intent" and "motive" interchangeably in one portion of his closing argument, he also told the jury to follow the judge's instructions. There is no indication that the jury did not understand or heed the trial court's CALCRIM No. 1401 instruction. (*People v. Yeoman, supra,* 31 Cal.4th at p. 139 [we presume jurors are able to understand and follow instructions]; *People v. Vang* (2009) 171 Cal.App.4th 1120, 1129 [we presume jurors can understand and correlate all instructions given].)

Viewing the instructions together, it is not reasonably likely the jury misunderstood or misapplied the CALCRIM No. 370 instruction in the manner asserted by Ellington. (*People v. Smithey* (1999) 20 Cal.4th 936, 963 [correctness of jury instructions is to be determined from the entire charge of the trial court].)

X

Ellington also claims that the cumulative effect of the errors relating to illegal detention, suggestive show-up, denial of bifurcation, admission of evidence about the Lewis incident and the cell phone photographs, insufficiency of evidence supporting aiding and abetting and the gang enhancement, and instructional error deprived him of a fair trial. Having found no prejudicial error, Ellington's claim lacks merit.

XI

We permitted Ellington to submit supplemental briefing challenging the trial court's order requiring Ellington to pay victim restitution.

The trial court ordered Ellington to pay $2,000 in victim restitution pursuant to section 1202.4, subdivision (f). Ellington did not object to that order. Nonetheless, he argues on appeal that the order violates his Sixth Amendment right to have a jury determine the facts upon which the restitution order is based. He contends his failure to object below did not forfeit his appellate claim because he could not have anticipated the change in the law occasioned by the holding in *Southern Union Co. v. United States* (2012) ___ U.S. ___ [183 L.Ed.2d 318] (*Southern Union Co.*). If objection is necessary to preserve the issue for appeal, he claims his trial counsel rendered ineffective assistance by failing to object.

Ellington contends that because a victim restitution order is a criminal penalty, a jury must determine the facts upon which such order is based. This claim is based on the holdings in *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435] (*Apprendi*), *Blakely v. Washington* (2004) 542 U.S. 296 [159 L.Ed.2d 403] (*Blakely*) and *Southern Union Co., supra,* ___ U.S. ___ [183 L.Ed.2d 318].

In *Apprendi*, it was held that the Sixth and Fourteenth Amendments to the federal Constitution require that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." (*Apprendi, supra*, 530 U.S.

54

at pp. 476, 490 [147 L.Ed.2d at pp. 446, 455].) Four years later, in *Blakely*, the Supreme Court again held that a defendant has a Sixth Amendment right to have a jury determine a fact which subjects him to a prison term in addition to the statutory maximum for his crime. (*Blakely, supra,* 542 U.S. at pp. 298, 303-305 [159 L.Ed.2d at pp. 410, 413-415].) "[T]the 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant. [Citations.] In other words, the relevant 'statutory maximum' is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose without any additional findings." (*Id.* at pp. 303-304 [159 L.Ed.2d at pp. 413-414], italics omitted.) More recently, in *Southern Union Co.,* the Supreme Court held that *Apprendi* applies to sentences of criminal fines. (*Southern Union Co., supra,* ___ U.S. at p. ___ [183 L.Ed.2d at p. 325].) The Supreme Court said that criminal fines are penalties, and facts such as the duration of a violation, which determine the amount of a fine, must be submitted to a jury to be determined beyond a reasonable doubt. (*Id.* at p. ___ [183 L.Ed.2d at p. 327].)

   *Apprendi, Blakely* and *Southern Union Co.* did not discuss victim restitution. Unlike the criminal fine at issue in *Southern Union Co.*, victim restitution is not a fine. And while the provisions for victim restitution and a restitution fine are both set forth in section 1202.4, victim restitution is different from a restitution fine. (Stats. 2007, ch. 302, § 14, pp. 3071-3077 [§ 1202.4, subds. (a)(3), (b), (f)] [treating restitution fine and victim restitution as separate]; *People v. Kunitz* (2004) 122 Cal.App.4th 652, 657 (*Kunitz*); *People v. Harvest* (2000) 84 Cal.App.4th 641, 647-648 (*Harvest*).) " '[A] restitution fine is mandatory even in the absence of a crime victim' [citation], but victim restitution obviously requires a victim [who has suffered a demonstrated loss as a result of the defendant's crime]." (*Harvest, supra*, 84 Cal.App.4th at p. 647.) A restitution fine is paid to the state, while victim restitution is paid to the victim. (*Id.* at p. 647.) A felony restitution fine is limited to a maximum of $10,000, but there is no specified limit for a

victim restitution order.  (Stats. 2007, ch. 302, § 14, pp. 3071-3077 [§ 1202.4,

subds. (b)(1), (f)].)  Section 1202.4 prescribes a formula and a list of relevant factors for

calculating a restitution fine.  (Stats. 2007, ch. 302, § 14, p. 3072 [§ 1202.4, subds. (b)(2),

(d)].)  The statute, however, does not contain a formula or criteria for calculating victim

restitution.  Victim restitution is simply based on the amount of loss claimed by the

victim or any other showing to the court, and must provide the victim "full" restitution

unless the trial court expressly finds compelling and extraordinary reasons for not

providing full restitution.[14]  (Stats. 2007, ch. 302, § 14, pp. 3072-3077 [§ 1202.4,

subds. (f), (g)].)

Moreover, victim restitution is not punitive.  (*Kunitz, supra,* 122 Cal.App.4th at

p. 657; *Harvest, supra,* 84 Cal.App.4th at pp. 646-649 ["the Legislature intended victim

restitution as a civil remedy rather than as a criminal punishment"].)  Restitution paid to

the victim is enforceable as if the order were a civil judgment.  (Stats. 2007, ch. 302,

§ 14, pp. 3071, 3077 [§ 1202.4, subds. (a)(3)(B), (i)].)  Although restitution serves a

rehabilitative and deterrent purpose (Stats. 1994, ch. 1106, § 1, p. 6548), "the primary

purpose of victim restitution is to provide monetary compensation to an individual

injured by crime.  [Citations.]  Compensation is the defining feature of civil law.

[Citations.]" (*Harvest, supra*, 84 Cal.App.4th at p. 648; see also Cal. Const., art. 1, § 28,

subd. (b); Stats. 2007, ch. 302, § 14, pp. 3071-3077 [§ 1202.4, subds. (a)(1), (f), (g)];

*People v. Jennings* (2005) 128 Cal.App.4th 42, 57; *People v. Bernal* (2002)

101 Cal.App.4th 155, 168.)  The Legislature did not identify punishment for the

defendant's crime as a purpose of victim restitution.  (Stats. 1994, ch. 1106, § 1, p. 6548.)

Nor is the victim restitution order so punitive in purpose or effect as to transform it

into a criminal penalty.  (*Harvest, supra*, 84 Cal.App.4th at pp. 649-650.)  Here, nothing

_____

**14**  Under the Victims' Bill of Rights Act of 2008 or Marsy's Law, victims have a
constitutional right to restitution.  (Cal. Const., art. I, § 28, subd. (b)(13).)

in the record shows that the amount ordered overcompensated the victim or would cause Ellington to "be mired in debt for the rest of" his life.

Ellington cites *People v. Moser* (1996) 50 Cal.App.4th 130 (*Moser*) and *People v. Brown* (2007) 147 Cal.App.4th 1213 (*Brown*) for the proposition that victim restitution is a criminal penalty, but those cases are distinguishable. *Moser* involved whether a court can order the defendant in a criminal case to pay restitution to a victim whose civil claim against the defendant for the damage covered by the restitution order was discharged in bankruptcy. (*Moser, supra*, 50 Cal.App.4th at p. 132.) This court held that because victim restitution did not serve the purpose of forced payment of a discharged debt, it was not precluded by the Bankruptcy Code. (*Id.* at p. 136.) *Moser* did not discuss section 1202.4, or victim restitution, in the context of a Sixth Amendment claim, and Ellington does not contend that the distinct purposes of bankruptcy discharge and victim restitution require vacating the trial court's victim restitution order.

*Brown* involved victim restitution in connection with section 1192.5, which provided that " '[w]here the plea is accepted by the prosecuting attorney in open court and is approved by the court, the defendant . . . cannot be sentenced on the plea to a punishment more severe than that specified in the plea . . . .' " (*Brown, supra*, 147 Cal.App.4th at pp. 1221, 1224, italics omitted.) The issue was whether victim restitution could significantly exceed what the parties contemplated in the plea agreement. (*Id.* at pp. 1221-1222.) The appellate court held that for purposes of section 1192.5, the victim restitution order in that case was a punishment more severe than that specified in the plea. (*Id.* at pp. 1221-1224.) But again, Brown did not discuss section 1202.4, or victim restitution, in the context of a Sixth Amendment claim, and this case does not involve the application of section 1192.5 to a plea agreement.

Because victim restitution is not a criminal fine and does not "increase the penalty" for Ellington's crimes, *Apprendi, Blakely* and *Southern Union Co.* are not applicable and the trial court's determination of victim restitution does not violate

Ellington's Sixth Amendment right to a jury trial. (*People v. Pangan* (2013) 213 Cal.App.4th 574, 585; *People v. Chappelone* (2010) 183 Cal.App.4th 1159, 1183-1184; *People v. Millard* (2009) 175 Cal.App.4th 7, 35-36; see also *U.S. v. Wolfe* (7th Cir. 2012) 701 F.3d 1206, 1216-1217; *U.S. v. Day* (4th Cir. 2012) 700 F.3d 713, 732; *U.S. v. Dupes* (2d Cir. 2008) 513 F.3d 338, 345-346; *U.S. v. Leahy* (3d Cir. 2006) 438 F.3d 328, 337-338.)

Of course, even if victim restitution constituted punishment, *Apprendi* requires jury factfinding only where a fact, other than the fact of a prior conviction, " 'increases the penalty for a crime beyond the prescribed statutory maximum.' " (*Southern Union Co.*, *supra*, ___ U.S. at pp. ___ [183 L.Ed.2d at pp. 325-327].) There can be no *Apprendi* violation where no maximum is prescribed. (*Id.* at p. ___ [183 L.Ed.2d at p. 330].) Unlike with a restitution fine, "there is no prescribed statutory maximum in the [victim] restitution context; the amount of restitution that a court may order is instead indeterminate and varies based on the amount of damage and injury caused by the offense. [Citation.] As a consequence, the rule of *Apprendi* is simply not implicated to begin with by a trial court's entry of [victim] restitution." (*U.S. v. Day, supra,* 700 F.3d at p. 732, italics omitted.)

XII

We also permitted Ellington to submit supplemental briefing to challenge the trial court's order requiring Ellington to pay a $3,800 restitution fine pursuant to section 1202.4, subdivision (b). Again relying upon *Apprendi, Blakely* and *Southern Union Co.,* Ellington claims that because the fine was substantial, a jury must determine his ability to pay.

Judges have historically exercised discretion--taking into consideration the factors relating to offense and offender--in imposing a judgment within the range prescribed by statute. (*Apprendi, supra*, 530 U.S. at p. 481 [147 L.Ed.2d at pp. 449-450]; *Southern Union Co., supra*, ___ U.S. at p ___ [183 L.Ed.2d at p. 330].) The exercise of such

58

discretion is fully consistent with *Apprendi*. (*Southern Union Co., supra*, ___ U.S. at p. ___ [183 L.Ed.2d at p. 330].) Two California appellate courts have rejected the argument that imposing a section 1202.4, subdivision (b) restitution fine without jury findings violates *Apprendi* and *Blakely*. (*People v. Kramis* (2012) 209 Cal.App.4th 346, 351-352 (*Kramis*); *People v. Urbano* (2005) 128 Cal.App.4th 396, 405-406 (*Urbano*).)

The appellate court in *Kramis* considered whether the holding in *Southern Union Co.* had any effect on a $10,000 section 1202.4, subdivision (b) restitution fine. (*Kramis, supra*, 209 Cal.App.4th at pp. 348-349.) With exceptions irrelevant to our analysis, the version of section 1202.4, subdivision (b) examined in *Kramis* is identical to the version of the statute in effect at the time of Ellington's crimes. (Stats. 2007, ch. 302, § 14, pp. 3071-3072; Stats. 2008, ch. 468, § 1, p. 3341; *Kramis, supra*, 209 Cal.App.4th at pp. 349-350.) Under those versions of section 1202.4, subdivision (b), a restitution fine is set at the discretion of the court and must be commensurate with the seriousness of the offense, but shall not be less than $200 and not more than $10,000 if the defendant is convicted of a felony. (Stats. 2007, ch. 302, § 14, pp. 3071-3072 [§ 1202.4, subd. (b)(1)]; *Kramis, supra*, 209 Cal.App.4th at p. 350.) In setting the amount of the felony restitution fine in excess of $200, the trial court considers any relevant factors including, but not limited to, the defendant's inability to pay, the seriousness and gravity of the offense and the circumstances of its commission, any economic gain derived by the defendant as a result of the crime, the extent to which any other person suffered any losses as a result of the crime, and the number of victims involved in the crime. (Stats. 2007, ch. 302, § 14, p. 3072 [§ 1202.4, subd. (d)]; *Kramis, supra*, 209 Cal.App.4th at p. 350.)

The court in *Kramis* concluded that *Apprendi* and *Southern Union Co*. do not apply when, as in that case, the trial court exercised its discretion within the statutory range. (*Kramis, supra*, 209 Cal.App.4th at pp. 350-351.) The court explained that because the $10,000 restitution fine imposed by the trial court was within the statutory range between $200 and $10,000, the trial court did not make any factual findings that

59

increased the potential fine beyond what the jury's verdict allowed. (*Id.* at pp. 351-352.) In *Urbano*, the appellate court similarly reasoned that *Blakely* and *Apprendi* do not apply when the exercise of judicial discretion stays within a sentencing range authorized by section 1202.4, subdivision (b). (*Urbano, supra*, 128 Cal.App.4th at pp. 405-406.)

Like the restitution fines imposed in *Kramis* and *Urbano,* the $3,800 restitution fine the trial court imposed in this case is within the statutory range prescribed in section 1202.4, subdivision (b). (Stats. 2007, ch. 302, § 14, pp. 3071-3072 [§ 1202.4, subd. (b)(1)].) The trial court's exercise of discretion within that statutorily prescribed range does not violate *Apprendi, Blakely* and *Southern Union Co.*

XIII

Citing *People v. Rodriguez* (2009) 47 Cal.4th 501 (*Rodriguez*), Hines and Byrd claim the trial court violated section 1170.1, subdivision (f) by imposing a 10-year enhancement under section 12022.53, subdivision (b) (firearms use) and a second 10-year enhancement under section 186.22, subdivision (b)(1)(C) (gang benefit) in count two.

The jury convicted Hines and Byrd of the attempted first degree robbery of Daughter in count two and found true the allegations that they personally used a firearm in the commission of the attempted robbery (§ 12022.53, subd. (b)) and acted for the benefit of, at the direction of and in association with a criminal street gang (§ 186.22, subd. (b)(1)(C)). The trial court sentenced Hines to the midterm of three years, doubled for a prior strike conviction. The trial court then imposed an additional 10-year prison term under section 12022.53, subdivision (b), and a separate 10-year term under section 186.22, subdivision (b)(1)(C). The trial court sentenced Byrd to the midterm of three years, plus a 10-year enhancement under section 12022.53, subdivision (b), and an additional 10-year enhancement under section 186.22, subdivision (b)(1)(C).

Defendants and the Attorney General agree that count two qualified as a violent felony under section 667.5, subdivision (c), and that Hines and Byrd were eligible for the 10-year enhancement under section 186.22, subdivision (b)(1)(C) because the jury found

that they violated section 12022.53. The Attorney General further agrees, based on *Rodriguez, supra,* 47 Cal.4th 501, that the imposition of both the section 12022.53, subdivision (b) enhancement and the section 186.22, subdivision (b)(1)(C) enhancement in count two violates section 1170.1, subdivision (f). We do not agree, however, that *Rodriguez* controls the issue before us.

In *Rodriguez,* the defendant was convicted of three counts of assault with a firearm (§ 245, subd. (a)(2)) against three victims of a gang shooting. (*Rodriguez, supra,* 47 Cal.4th at pp. 504-506.) As to each count, the jury found to be true the allegations that the defendant personally used a firearm (§ 12022.5, subd. (a))[15] and that the assault was a "violent felony" committed to benefit a criminal street gang (§ 186.22, subd. (b)(1)(C)). (*Rodriguez, supra*, 47 Cal.4th at pp. 504-506.) In two of the counts, the trial court imposed enhancements under both section 12022.5 and section 186.22. (*Id.* at p. 506.) The California Supreme Court held this sentence violated section 1170.1, subdivision (f). (*Id.* at p. 504.) It said that where firearms use resulted in punishment under two different sentence enhancement provisions, each pertaining to firearm use, section 1170.1, subdivision (f) requires the imposition of only the greater of the enhancements for each offense. (*Id.* at p. 509.) Section 1170.1, subdivision (f) provided: "When two or more enhancements may be imposed for being armed with or using a dangerous or deadly weapon or a firearm in the commission of a single offense, only the greatest of those enhancements shall be imposed for that offense. This subdivision shall not limit the

---

**15** Section 12022.5, subdivision (a) stated: "Except as provided in subdivision (b) [which relates to a person who personally uses an "assault weapon" or "machinegun"], any person who personally uses a firearm in the commission of a felony or attempted felony shall be punished by an additional and consecutive term of imprisonment in the state prison for 3, 4, or 10 years, unless use of a firearm is an element of that offense." (*Rodriguez, supra*, 47 Cal.4th at p. 505.)

imposition of any other enhancements applicable to that offense, including an enhancement for the infliction of great bodily injury."

*Rodriguez* does not involve a sentence enhancement under section 12022.53, the firearm enhancement statute applied in count two here. The pertinent provisions of section 12022.53 at the time of defendants' crimes remain in the current version of the statute. (Stats. 2006, ch. 901, § 11.1, p. 7076.) Section 12022.53, subdivision (b) states: "Notwithstanding any other provision of law, any person who, in the commission of a felony specified in subdivision (a) [which includes attempted robbery], personally uses a firearm, shall be punished by an additional and consecutive term of imprisonment in the state prison for 10 years."

Of significance, section 12022.53 specifically addresses sentencing in a case where a firearm use enhancement and a gang enhancement have been established. Section 12022.53, subdivision (e)(2) instructs: "An enhancement for participation in a criminal street gang pursuant to Chapter 11 (commencing with Section 186.20) of Title 7 of Part 1 shall not be imposed on a person in addition to an enhancement imposed pursuant to this subdivision, unless the person personally used or personally discharged a firearm in the commission of the offense." (Stats. 2006, ch. 901, § 11.1, p. 7076.) No analogous provision is found in section 12022.5, the firearms use enhancement statute applied in *Rodriguez, supra,* 47 Cal.4th 501. (*People v. Robinson* (2012) 208 Cal.App.4th 232, 257-258 (*Robinson*).)

The second enhancement provision involved here is section 186.22, subdivision (b)(1)(C), which provided then and currently states, "any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members, shall, upon conviction of that felony, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which he or she has been convicted, be punished as follows: [¶] . . . [¶] (C) If the felony is a

62

violent felony, as defined in subdivision (c) of Section 667.5, the person shall be punished by an additional term of 10 years." (Stats. 2006, ch. 596, § 1, pp. 4929-4930.) At all relevant times, section 667.5, subdivision (c)(22) defined a violation of section 12022.53 as a violent felony. Thus, a violation of section 12022.53 subjects a person convicted of a gang-related felony to an additional prison term of 10 years under section 186.22, subdivision (B)(1)(C).

The appellate court in *Robinson, supra,* 208 Cal.App.4th 232, examined the effect of *Rodriguez* on a sentence involving both a section 12022.53, subdivision (b) enhancement and a section 182.22, subdivision (b)(1)(C) enhancement. The defendant in *Robinson* was eligible for enhanced punishment under both of these statutes based on his personal use of a firearm. (*Robinson, supra,* 208 Cal.App.4th at pp. 256-257.) In light of *Rodriguez, supra*, 47 Cal.4th 501, the trial court imposed a 10-year prison term for the section 12022.53, subdivision (b) enhancement, but stayed the prison term imposed for the section 186.22, subdivision (b)(1)(C) enhancement. (*Id.* at p. 256.) The Attorney General cross-appealed, claiming that the stay of the section 186.22, subdivision (b)(1)(C) enhancement was error under section 12022.53, subdivision (e)(2). (*Id.* at pp. 255, 257-258.)

After reviewing *Rodriguez* and section 12022.53, the appellate court in *Robinson* agreed with the Attorney General. The court concluded that section 12022.53, subdivision (e)(2), which expressly authorized the imposition of the gang and firearm use enhancements where the defendant personally used a firearm in the commission of the offense, conflicted with section 1170.1, subdivision (f), which directed that only one firearm enhancement be imposed. (*Robinson, supra,* 208 Cal.App.4th at p. 258.) The court in *Robinson* examined the legislative history of section 12022.53, subdivision (e)(2) and section 1170.1, subdivision (f), which were enacted nearly simultaneously in 1997. (*Id.* at pp. 258-259.) But those provisions did not reference each other or mention the conflict between them. (*Id.* at p. 259.) The court in *Robinson* turned to the language of

section 12022.53, subdivision (e)(2) to resolve the statutory conflict. It concluded that section 12022.53, subdivision (e)(2) specifically addressed the gang and firearm use enhancements whereas section 1170.1, subdivision (f) related to firearm use enhancements generally. (*Id.* at pp. 259-260.) Applying the maxim that the specific statute controls and is treated as an exception to the general statute where there is a conflict between a general statute and a specific one, the court in *Robinson* held that section 12022.53, subdivision (e)(2) controlled. (*Id.* at pp. 260-261.) The court concluded that where a defendant is found to have personally used a firearm in the commission of a qualifying offense, section 12022.53, subdivision (e)(2) authorizes the imposition of both the section 12022.53, subdivision (b) and the section 186.22, subdivision (b)(1)(C) enhancements. The *Robinson* court said that "treating section 12022.53(e)(2) as an exception to section 1170.1(f) is consistent with the Legislature's intent to impose enhanced punishment on those who personally use firearms in gang-related felonies." (*Id.* at p. 261, italics omitted.)

The conclusion in *Robinson* that section 12022.53, subdivision (e)(2) authorizes the imposition of both section 12022.53, subdivision (b) and section 186.22, subdivision (b)(1)(C) enhancements when the defendant personally used a firearm finds support in *People v. Brookfield* (2009) 47 Cal.4th 583 (*Brookfield*). *Brookfield* examined the interplay between section 12022.53 and 186.22 and interpreted section 12022.53, subdivision (e)(2) in the context of a case where the defendant was convicted of a gang-related crime wherein he did not personally use or discharge a firearm, but his companion did. (*Id.* at pp. 586, 588.) Referring to section 12022.53, subdivision (e)(2), the Supreme Court said, "[a] defendant who personally uses or discharges a firearm in the commission of a gang-related offense is subject to both the increased punishment provided for in section 186.22 and the increased punishment provided for in section 12022.53. In contrast, when another principal in the offense uses or discharges a firearm but the defendant does not, there is no imposition of an 'enhancement for participation in a

64

criminal street gang . . . in addition to an enhancement imposed pursuant to' section 12022.53. [Citation.]" (*Id.* at p. 590, italics omitted.) Discussing section 12022.53's sentencing scheme, the Supreme Court reiterated that those offenders who personally used or discharged a firearm in committing a gang-related offense specified in section 12022.53 are subject to both the enhancement provisions of section 12022.53 and the gang-related sentence increases of section 186.22. (*Id.* at p. 593.) The Supreme Court concluded that subjecting a defendant who personally used or discharged a firearm in a gang-related felony to greater punishment for both the gang enhancement under section 186.22 and the firearm use enhancement under section 12022.53 is consistent with the Legislature's goal in section 12022.53, subdivision (e) of reserving the most severe sentences for this group of offenders. (*Id.* at p. 594.)

Based on section 12022.53, subdivision (e)(2), *Brookfield, supra,* 47 Cal.4th 583 and *Robinson, supra,* 208 Cal.App.4th 232, we conclude the trial court did not err in imposing both the section 12022.53, subdivision (b) enhancement and the section 186.22, subdivision (b)(1)(C) enhancement on count two because the jury found that Hines and Byrd personally used a firearm in the commission of the attempted robbery.

XIV

Hines claims the trial court erred by imposing five-year sentence enhancements pursuant to section 667, subdivision (a) on the determinate terms for counts two (attempted robbery) and six (sexual battery). The Attorney General agrees, and we do too.

Section 667, subdivision (a)(1) provides that any person convicted of a "serious felony" who has a prior serious felony conviction in this state shall receive, in addition to the sentence imposed for the present offense, a five-year enhancement for each such prior conviction on charges brought and tried separately. A "serious felony" is a serious felony listed in section 1192.7, subdivision (c). (§ 667, subd. (a)(4).)

65

Counts two, five and six qualify as serious felonies within the meaning of section 667, subdivision (a)(1) because the jury found that Hines personally used a firearm in the commission of the offenses charged in those counts, and the crimes of which Hines was convicted in counts two (attempted robbery) and five (assault with intent to commit rape) are serious felonies under section 1192.7, subdivision (c). (§ 1192.7, subds. (c)(8), (19), (29) & (39).) The trial court found that Hines was convicted of second degree robbery in 2006, which also qualifies as a serious felony under section 667, subdivision (a)(1). (§ 1192.7, subd. (c)(19).) Because he was convicted of a serious felony and had a prior serious felony conviction, Hines was eligible for enhanced punishment under section 667, subdivision (a)(1).

However, the section 667, subdivision (a)(1) enhancement can be used only once to enhance the aggregate determinate term, regardless of the number of determinate terms that make up the total determinate sentence. (*People v. Tassell* (1984) 36 Cal.3d 77, 90, overruled on other grounds in *People v. Ewoldt* (1994) 7 Cal.4th 380, 401.) The trial court erred by imposing five-year enhancements pursuant to section 667, subdivision (a)(1) to each determinate term in counts two and six. One of those five-year enhancements must be stricken.

XV

The Attorney General also agrees with Hines that the trial court erred in imposing a full-term sentence against Hines on count six (sexual battery).

Felony sexual battery is punishable by imprisonment in state prison for two, three or four years. (§ 243.4, subd. (a).) The trial court selected the midterm of three years, and sentenced Hines to the full midterm, doubled under sections 667, subdivision (e)(1) and 1170.12, subdivision (c)(1),[16] plus a full midterm of four years for the

---

[16] Section 667, subdivision (e)(1) and section 1170.12, subdivision (c)(1) provide that in addition to any other enhancement or punishment provisions which may apply, if a

66

section 12022.5, subdivision (a) firearms use enhancement and a full midterm of three years for the section 186.22, subdivision (b)(1) gang enhancement, for a total of 13 years, to be served consecutive to the other prison terms.  Because the trial court selected the count two sentence as the principal term, the sentence on count six must be a subordinate term.

Where, as here, a defendant is convicted of a serious felony and has a prior conviction for a strike and the trial court imposes consecutive prison terms, the determinate terms are calculated pursuant to section 1170.1.  (*People v. Nguyen* (1999) 21 Cal.4th 197, 203-204, 207.)  As the California Supreme Court explained, under section 1170.1 the trial court "must designate principal and subordinate terms . . . , calculating the subordinate terms as one-third of the middle term (except when full-term consecutive sentences are otherwise permitted or required), and then double each of the resulting terms."  (*People v. Nguyen, supra,* 21 Cal.4th at pp. 203-204, 207.)  The term for an enhancement is not doubled.  (*People v. Moody* (2002) 96 Cal.App.4th 987, 990-994; *People v. Dominguez* (1995) 38 Cal.App.4th 410, 424.)

Neither Hines nor the Attorney General assert, and we find no basis for concluding, that a full-term sentence is required for count six.  We will remand the matter to permit the trial court to resentence Hines pursuant to section 1170.1, subdivision (a).

XVI

Hines next claims that the trial court should have imposed a concurrent sentence on count six.  According to Hines, section 667, subdivisions (c)(6) and (c)(7) do not mandate consecutive sentencing because the count six crime of sexual battery occurred on the "same occasion" and was based on "the same set of operative facts" as the count five crime of assault with intent to commit rape.  If his appellate contention is

---

defendant has one prior violent or serious felony conviction that has been pled and proved, the determinate sentence shall be twice the term otherwise provided as punishment for the current felony conviction.

67

forfeited by his failure to raise it at trial, Hines asserts his trial counsel rendered ineffective assistance by failing to object. Accordingly, we address the merits of Hines's consecutive sentence claims even though he did not object on these grounds at trial in order to forestall his ineffective assistance claim.

Where a defendant is sentenced on multiple felony counts under the three strikes law because he has previously been convicted of at least one serious or violent felony, the trial court must sentence the defendant consecutively on each count unless the current felonies were committed on the same occasion or arose from the same set of operative facts. (§§ 667, subd. (c)(6), 1170.12, subd. (a)(6); *People v. Deloza* (1998) 18 Cal.4th 585, 590-591 (*Deloza*).) If the current felonies were committed on the same occasion or arose from the same set of operative facts, the trial court has discretion to impose a consecutive or concurrent sentence. (*Deloza, supra,* 18 Cal.4th at pp. 590-591.) The trial court reviews the facts established at trial and those presented at sentencing to determine whether the current felonies occurred on the same occasion or arose from the same set of operative facts. (*People v. Hall* (1998) 67 Cal.App.4th 128, 137-138.)

The term "same occasion," as used in section 667, refers to a close temporal and spatial proximity between the acts underlying the current felony convictions. (*Deloza, supra,* 18 Cal.4th at pp. 594-595.) A crime is not committed on the same occasion if it is complete when the second crime is being committed. (*People v. Durant* (1999) 68 Cal.App.4th 1393, 1405-1406.)

In *People v. Jenkins* (2001) 86 Cal.App.4th 699, 703-704, the defendant broke into the apartment that his former girlfriend shared with her children and chased the girlfriend to an upstairs bedroom while threatening to kill her with a knife. The girlfriend's daughter went to her mother's aid, but the defendant pushed the daughter down the stairs, causing her to suffer various cuts. (*Id.* at p. 704.) When the girlfriend succeeded in disarming the defendant, the defendant went down the stairs to the kitchen and obtained another knife. (*Ibid.*) He pushed the apartment manager who tried to intercede and

returned to the upstairs bedroom, forced his way into the room, and stabbed his former girlfriend multiple times.  (*Id.* at pp. 704-705.)  The defendant was sentenced under the three strikes law to 25 years to life for the aggravated assault upon the daughter, to be served consecutive to the 25-years-to-life sentence for the attempted premeditated murder against the former girlfriend.  (*Id.* at pp. 701.)  The appellate court held that, under section 667, subdivision (c)(6), consecutive sentencing was required for these crimes because they were not committed on the same occasion and did not arise from the same set of operative facts.  (*Id.* at p. 706.)  It noted that the assault against the daughter was complete when the defendant pushed her down the stairs and, even though the assault and the attempted murder occurred within the same apartment, the offenses against the daughter and the former girlfriend were separated in time and location.  (*Id.* at pp. 706-707.)  After committing the assault against the daughter on the stairway, the defendant did not immediately continue to try to force his way into the upstairs bedroom where the former girlfriend was located.  (*Ibid.*)  Instead, he went downstairs, armed himself with another knife, and pushed his way past the apartment manager before returning upstairs to stab his former girlfriend.  (*Ibid.*)  The appellate court also noted that the elements of attempted murder and aggravated assault are different.  (*Id.* at p. 707.)

Applying *Deloza, supra,* 18 Cal.4th 585 [robberies were on the same occasion because they were committed essentially simultaneously in one location within a brief duration against the same victims], *People v. Jenkins, supra,* 86 Cal.App.4th 699, and *People v. Durant, supra,* 68 Cal.App.4th 1393 [crimes committed in succession at different units within a condominium complex were not committed on the same occasion nor did they arise from the same set of operative facts because each crime was complete before the defendant committed the next crime], we conclude the trial court did not err in imposing a consecutive sentence on count six because the record supports the finding that the crimes of assault with intent to commit rape and sexual battery were committed at different times and places.

69

The assault with intent to commit rape (count five) was committed on the stairs of the victims' home when one of the armed intruders pointed a gun at Daughter and ordered her to get down, Daughter was hit with a gun and punched in the face, one of the intruders yelled "strip the bitch," and Byrd took off Daughter's shirt and bra. The crime was complete when, during the assault in the stairway, the conduct of Byrd and the surrounding circumstances showed an intent to commit rape. (*People v. Maury* (2003) 30 Cal.4th 342, 399-400; *People v. Meichtry* (1951) 37 Cal.2d 385, 388-389.)

The sexual battery (count six) was committed in a different location within the house and after Daughter was dragged upstairs and battered in the upstairs hallway bathroom. (*Jenkins, supra,* 86 Cal.App.4th at p. 707 [commission of crimes within the same apartment does not preclude a finding that crimes were not committed on the same occasion].) The conduct in the bathroom was an "event that could be considered to separate one [crime] from another." (*Deloza, supra*, 18 Cal.4th at p. 596.) After hitting Daughter in the bathroom, Byrd took her to Mother's bedroom, bent her over the bed, hit her when she tried to call for help, and touched her bare breast with his hand. The jury found that Hines aided and abetted Byrd in committing the crimes of assault with intent to commit rape and sexual battery.

Additionally, the crime of assault with intent to commit rape is different from the crime of sexual battery. (§§ 220, 243.4, subd. (a), 261; *People v. Dixon* (1999) 75 Cal.App.4th 935, 943.) Based on the above, the trial court did not err in imposing a consecutive sentence on count six.

Hines argues the trial court erroneously applied a section 667.6 standard when it considered whether Hines had an opportunity to reflect on his actions in deciding whether to impose a consecutive sentence. In imposing a consecutive sentence on count six, the trial court said: "Counts 5 and 6 were committed at different times and places, as the victim was moved from one location to another. [¶] The defendant did have an opportunity to reflect on his actions. The second consecutive sentencing is warranted for

70

those reasons." The trial court did not say it was imposing a consecutive term on count six pursuant to section 667.6. In any event, we find no error.

Section 667.6 requires a consecutive sentence for certain sexual offenses "if the crimes involve separate victims or involve the same victim on separate occasions." (§ 667.6, subd. (d).) In determining whether crimes against a single victim were committed on separate occasions under that statute, a court must "consider whether, between the commission of one sex crime and another, the defendant had a reasonable opportunity to reflect upon his or her actions and nevertheless resumed sexually assaultive behavior." (§ 667.6, subd. (d).) The California Supreme Court held that section 667.6 may be of limited help in determining whether a defendant's current felonies were committed on the same occasion within the meaning of the three strikes law. (*Deloza, supra*, 18 Cal.4th at pp. 596-599.) But the fact that Hines had an opportunity to reflect on his actions could indicate an intervening event separating one crime from another. We are not persuaded that the trial court's "opportunity to reflect" statement evidences error. (*People v. Jenkins, supra,* 86 Cal.App.4th at pp. 706-707 [noting that defendant had sufficient time to consider the consequences of continuing to commit new criminal acts where there were intervening events between assault of one victim and attack against second victim in concluding that consecutive sentencing was mandatory].)

We further conclude that the assault with intent to commit rape and the sexual battery do not arise from the same set of operative facts. The phrase "same set of operative facts" in section 667, subdivision (c)(6) refers to "the facts of a case which prove the underlying act upon which a defendant had been found guilty." (*People v. Lawrence* (2000) 24 Cal.4th 219, 231-232.) Offenses do not arise from the same set of operative facts if they do not share common acts or criminal conduct that serve to establish the elements of the offenses. (*Id.* at pp. 233-234.) " 'In applying this definition to any particular case, the nature and elements of the current charged offense becomes

71

highly relevant. For example, when a robbery is charged, its continuous nature, its elements and the facts used to support those elements are the "operative facts" underlying the commission of that crime. If another offense is committed while the facts underlying that robbery are unfolding, it will necessarily arise from the same set of operative facts as the original robbery. However, where the elements of the original crime have been satisfied, any crime subsequently committed will not arise from the same set of operative facts underlying the completed crime; rather such crime is necessarily committed at a different time. For instance, with the crime of burglary, where the offense is complete when there is an entry into a structure with felonious intent, "regardless of whether the felony or theft committed is different from that contemplated at the time of entry, or whether any felony or theft actually is committed" [citation], the commission after the first burglary of a crime or burglary of another structure necessarily will arise out of different operative facts than those underlying the original offense.' [Citation.]" (*Id.* at pp. 232-233.)

As we have explained, the acts which establish the elements of the crimes of assault with intent to commit rape and sexual battery do not overlap. The assault with intent to commit rape was complete before Byrd went on to commit the offense of sexual battery in the upstairs bedroom.

In sum, the trial court did not err in imposing a consecutive sentence on count six because section 667, subdivision (c)(6) mandated that sentence. But even if consecutive sentencing was not mandatory under section 667, subdivision (c)(6), we would find no abuse of discretion by the trial court in selecting a consecutive sentence. In exercising its discretion to impose consecutive or concurrent sentences when section 667, subdivision (c)(6) does not mandate consecutive sentencing, the trial court considers the criteria set forth in rule 4.425 of the California Rules of Court. (*Deloza, supra,* 18 Cal.4th at p. 596, fn. 8.) Such criteria include whether the crimes and their objectives were predominantly independent of each other and whether the crimes were committed at

72

different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior. (Cal. Rules of Court, rule 4.425(a) (rule 4.425).) We will not disturb the trial court's exercise of discretion in the absence of a clear showing that, considering all the circumstances, its determination exceeds the bounds of reason. (*People v. Lepe* (1987) 195 Cal.App.3d 1347, 1350; *People v. Oseguera* (1993) 20 Cal.App.4th 290, 294-295 [we do not disturb the trial court's rule 4.425 finding unless it is not supported by substantial evidence].) The count five and six crimes are distinct and do not overlap. (*People v. Oseguera, supra,* at pp. 294-295 [finding no error in imposing consecutive sentence under predecessor to rule 4.425 where crimes involved distinct acts, even though the crimes occurred at the same time and place]; *People v. Hunt* (1982) 133 Cal.App.3d 543, 562 [consecutive sentence was appropriate under predecessor to rule 4.425 where burglary of one apartment was predominantly independent of subsequent burglary of a different but nearby apartment].) Hines cannot demonstrate abuse of discretion in the imposition of a consecutive sentence on count six.

## XVII

Hines argues that the trial court should have stayed the sentence on count six pursuant to section 654 because the count five and six crimes shared the same criminal objective. But Hines concedes that section 654 does not apply when consecutive sentencing is mandated under the three strikes law. (*People v. Danowski* (1999) 74 Cal.App.4th 815, 823-824.) We do not address Hines's section 654 claim because, as we have explained, section 667, subdivision (c)(6) mandates a consecutive sentence in count six.

## XVIII

Johnson claims the trial court erred by failing to state its reasons for imposing the upper, instead of the middle or lower, term for the firearms use enhancement (§ 12022.5, subd. (a)).

73

In sentencing Johnson on count one, the trial court was authorized to impose a lower, middle or upper term on the section 12022.5 enhancement based on the jury's finding that Johnson personally used a firearm in the commission of the burglary. (§ 12022.5, subd. (a).) The trial court had discretion to impose the term that best served the interest of justice, but was required to state the reasons for its sentence choice on the record at the time of sentencing. (§ 1170.1, subd. (d); Cal. Rules of Court, rules 4.406, subd. (b)(4), 4.428.) Nonetheless, a defendant forfeits the objection that the trial court failed to state the reasons for a discretionary sentencing choice by failing to raise the objection below. (*People v. Scott* (1994) 9 Cal.4th 331, 353.) As the Supreme Court explained in *People v. Scott*, "[a]lthough the court is required to impose sentence in a lawful manner, counsel is charged with understanding, advocating, and clarifying permissible sentencing choices at the hearing. Routine defects in the court's statement of reasons are easily prevented and corrected if called to the court's attention." (*Ibid.*) Failure to timely object forfeits review of a claim concerning "discretionary sentencing choices--those 'which, though otherwise permitted by law, were imposed in a procedurally or factually flawed manner.' [Citation.]" (*People v. Stowell* (2003) 31 Cal.4th 1107, 1113.) Johnson's appellate claim falls within this category and is forfeited by his failure to raise the objection at trial.

Johnson claims the forfeiture rule articulated in *People v. Scott, supra*, 9 Cal.4th 331, does not apply to this case because his trial counsel argued for the low term after the trial court announced the tentative sentence. We disagree. Johnson never objected in the trial court that the trial court failed to state any reason for imposing the upper term on the section 12022.5 enhancement. The purpose of the rule requiring objection is to bring easily correctable defects to the trial court's attention and to give the trial court an opportunity to address such errors, thereby preserving the judicial resources otherwise required to correct them. (*Id.* at p. 353.) Given the trial court's statements about the aggravated nature of the armed burglary, the vulnerability of the victim, and that the

74

upper term for the weapon enhancement was necessary for a just sentence, the trial court could have easily corrected any oversight had Johnson objected at the sentencing hearing. Johnson's failure to object resulted in forfeiture.

## DISPOSITION

The sentences imposed against Hines on counts two and six are vacated, and the matter is remanded to the trial court to resentence Hines in accordance with parts XIV and XV of this opinion. Following resentencing, the trial court is directed to amend the abstract of judgment for Hines and to forward a certified copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation.

The judgments are otherwise affirmed.

                                                      MAURO          , J.

We concur:

          NICHOLSON        , Acting P. J.

          BUTZ             , J.